**Michael ANDERSON, et al., Plaintiffs,**

v.

**DEPARTMENT OF PUBLIC WELFARE, et al., Defendants.**

No. Civ.A. 97–3808.

United States District Court, E.D. Pennsylvania.

April 1, 1998.

---

Stephen F. Gold, Philadelphia, PA, Ilene W. Shane, Disabilities Law Project, Philadelphia, PA, for Plaintiffs.

Doris M. Leisch, Pa. Dept. of Public Welfare, Philadelphia, PA, John A. Kane, Dept. of Public Welfare—Legal Counsel, Philadelphia, PA, Doris M. Leisch, Dept. of Public Welfare, Office of Legal Counsel, Harrisburg, PA, Barry N. Kramer, Dept. of Public Welfare, Philadelphia, PA, for Defendant.

## MEMORANDUM

KAUFFMAN, District Judge.

Plaintiffs Michael Anderson, Joseph Garrison, and Disabled in Action of Pennsylvania ("DIA") (collectively, "Plaintiffs") bring this action against Defendants, the Department of Public Welfare ("DPW") and DPW Secretary, Feather Houstoun, pursuant to Part A of Title II of the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131–12134 (1995), and the regulations promulgated thereunder. In short, Plaintiffs allege that Defendants are violating Title II in three ways: first, by failing to require that *all* health care providers in DPW's mandatory managed care program practice in offices accessible to people with mobility impairments; second, by failing to provide all information related to the managed care program in alternative formats such as Braille, large print, and audiotape; and third, by using methods of administration that have discriminatory effects. Plaintiffs seek declaratory and injunctive relief.

Now before the Court are Plaintiffs' Motion for Class Certification, Plaintiffs' Motion for Summary Judgment, and Defendants' Cross–Motion for Partial Summary Judgment. For the reasons set forth herein, the Court grants Plaintiffs' Motion for Class Certification, grants in part and denies in part Plaintiffs' Motion for Summary Judgment, and denies Defendants' Cross–Motion for Summary Judgment. An Order accompanies this Opinion.

## BACKGROUND

Plaintiff Anderson uses a wheelchair and has limited vision; Plaintiff Garrison is blind; Plaintiff DIA is a nonprofit corporation. Defendant DPW is responsible for administering Pennsylvania's Medical Assistance Program.[1] DPW has mandated that all Medical Assistance recipients in Philadelphia, Bucks, Chester, Delaware, and Montgomery Counties receive their health care through health maintenance organizations ("HMOs"). The HMOs restrict the recipients' choice of health care providers to participating physicians and dentists selected by the HMOs. The program, effective September 1, 1997, is called "HealthChoices." Plaintiffs Anderson and Garrison are Medical Assistance recipients enrolled in HealthChoices.

DPW does not require the HealthChoices HMO network providers to practice in offices that are accessible to people with mobility impairments. DPW never considered whether provider offices would be accessible to disabled Medical Assistance recipients, either during the HMO bidding process or later, when it conducted "readiness reviews" of the four selected HMOs.[2] DPW does not require providers who practice in inaccessible offices to make house calls or to see disabled patients at another facility that is accessible.

DPW does require the HMOs to send each Medical Assistance recipient a provider directory. In addition to listing the names, addresses, telephone numbers, hospital affiliations, any board certifications, and office hours of the participating physicians and dentists, the directory marks those primary care physicians ("PCPs") who identify themselves as "specializing in the treatment of people with special needs."[3] The number of

---

1. The Medical Assistance Program is a cost-sharing arrangement authorized by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396v (1992 & Supp.1997). Under this program, the state and federal governments finance Medical Assistance to individuals whose resources are insufficient to cover the costs of their medical care.

2. In April 1996, DPW solicited bids from HMOs to participate in HealthChoices and ultimately entered into "provider agreements," effective February 1, 1997, with four HMOs: Keystone Mercy, Oxford, Health Partners, and HMA. All providers in the HMO provider networks are required to enroll in DPW's Medical Assistance Program.

3. DPW defines "special needs" broadly, as a

PCPs identifying themselves as "specializing in the treatment of people with special needs" varies widely by HMO and by county. Not every PCP identified as specializing in the treatment of people with special needs practices in an accessible office. The provider directories are DPW's only source of information regarding the number of accessible HealthChoices providers.[4]

DPW hired an independent benefits consultant to facilitate the HMO enrollment of Medical Assistance recipients. When a recipient enrolls in an HMO, the benefits consultant is expected to ascertain whether that person has a mobility impairment and then transmit that information to the HMO, thus allowing the HMO to assign that person an appropriate PCP.[5] Medical Assistance recipients with mobility impairments who enrolled in HMOs prior to June 1997 often were assigned to PCPs having inaccessible offices.[6]

The HMOs make some, but not all, of their materials available in Braille, large print, or audiotape. All four HMOs provide copies of

their member handbooks on audiotape; three of the four HMOs also provide copies of their member handbooks in Braille. None of the four HMOs has a provider directory available in any alternative format.

## DISCUSSION

### I. Class Certification

█ Plaintiffs request certification of the following class:

> All Medical Assistance recipients required to participate in HealthChoices, the mandatory managed care program in Philadelphia, Bucks, Chester, Delaware and Montgomery counties, who have impairments which substantially limit their mobility and/or vision.

### A. The Requirements of Rule 23(a)

Fed.R.Civ.P. 23(a) provides:

> [o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so

---

"non-categorical term that includes persons with disabilities, children, and persons who in a particular situation have a need for additional or special assistance." (Resp. of Def. to Pls.' Statement Uncontested Facts ¶ 110.)

4. After this action was filed, DPW reviewed the HMO provider directories to determine the number of providers who either (i) practice in hospitals or health centers, which are accessible to individuals with mobility impairments, or (ii) are indicated as specializing in the treatment of people with special needs. Although not every provider indicated as specializing in the treatment of people with special needs practices in an accessible facility, DPW used the "special needs" indicators as a basis for the following estimates:

The Keystone Mercy network of 1,562 PCPs includes 245 PCPs that are accessible (16%); the Oxford network of 1,355 PCPs includes 352 PCPs that are accessible (26%); the Health Partners network of 727 PCPs includes 328 PCPs that are accessible (45%); and the HMA network of 1,303 PCPs includes 919 PCPs that are accessible (71%).

In Bucks County: the Keystone Mercy network of 172 PCPs includes 6 that are accessible (3%); the Oxford network of 105 PCPs includes 30 that are accessible (29%); the Health Partners network of 46 PCPs includes 4 that are accessible (7%); the HMA network of 119 PCPs includes 85 that are accessible (71%).

In Chester County: the Keystone Mercy network of 90 PCPs includes 1 that is accessible (1%); the Oxford network of 98 PCPs includes 14

that are accessible (14%); the Health Partners network of 49 PCPs includes 49 that are accessible (100%); the HMA network of 78 PCPs includes 62 that are accessible (79%).

In Delaware County: the Keystone Mercy network of 184 PCPs includes 10 that are accessible (5%); the Oxford network of 170 PCPs includes 36 that are accessible (21%); the Health Partners network of 88 PCPs includes 29 that are accessible (33%); the HMA network of 126 PCPs includes 88 that are accessible (70%).

In Montgomery County: the Keystone Mercy network of 218 PCPs includes 8 that are accessible (4%); the Oxford network of 191 PCPs includes 17 that are accessible (9%); the Health Partners network of 31 PCPs includes 18 that are accessible (58%); the HMA network of 163 PCPs includes 130 that are accessible (80%).

In Philadelphia County: the Keystone Mercy network of 898 PCPs includes 225 that are accessible (25%); the Oxford network of 791 PCPs includes 255 that are accessible (32%); the Health Partners network of 513 PCPs includes 228 that are accessible (44%); the HMA network of 817 PCPs includes 557 that are accessible (68%).
(See Resp. of Def. to Pls.' Statement Uncontested Facts ¶¶ 78 – 81.)

5. The HMOs assign PCPs only when Medical Assistance recipients do not choose one themselves.

6. Plaintiffs filed this lawsuit on June 3, 1997.

numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

### 1. Numerosity/Impracticality of Joinder

■ Although commonly referred to as a "numerosity" requirement, "Rule 23(a)(1) is an impracticability of joinder requirement, of which class size is an inherent consideration within the rationale of joinder concepts." 1 HERBERT B. NEWBERG AND ALBA CONTE, NEWBERG ON CLASS ACTIONS, § 3.03, at 3–11 (3d ed.1992). Accordingly, "[t]here is no precise number necessary for class certification." *Metts v. Houstoun,* No.Civ.A. 97–4123, 1997 WL 688804, at \*2 (E.D.Pa. Oct.24, 1997). Apart from class size, factors relevant to an evaluation of the impracticability of joinder include judicial economy, the geographic diversity of class members, the financial resources of class members, the relative ease or difficulty in identifying members of the class for joinder, and the ability of class members to institute individual lawsuits. *See, e.g., Metts,* 1997 WL 688804, at \*2; *Sherman v. Griepentrog,* 775 F.Supp. 1383, 1389 (D.Nev.1991).

Here, the proposed class would include every mobility- or visually-impaired recipient of Medical Assistance in Southeastern Pennsylvania. Plaintiffs provide census figures, which show that approximately 5% of people nationwide use mobility devices such as wheelchairs, walkers, and canes and approximately 5% of people nationwide have difficulty seeing words and letters. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, STATISTICAL ABSTRACT OF THE U.S. 138, 145 (115th ed. 1995) (Chart Nos. 209, 222). Extrapolating from these statistics, Plaintiffs argue that approximately 25,000 of the 540,000 recipients of Medical Assistance in southeastern Pennsylvania would be members of the proposed class. Defendants argue that this figure, based on national statistics, is "merely speculative" and thus does not show that the putative class is sufficiently numerous.

■ The Court agrees with Plaintiffs that statistics tending to show that joinder would be impracticable may be sufficient to satisfy Rule 23(a)(1). *See Taylor v. White,* 132 F.R.D. 636, 646–47 (E.D.Pa.1990); *see, e.g., Vergara v. Hampton,* 581 F.2d 1281, 1284 (7th Cir.1978) (certifying class of resident aliens desiring jobs in the civil service, finding Rule 23(a)(1) satisfied by census figures); *Pottinger v. City of Miami,* 720 F.Supp. 955, 958 (S.D.Fla.1989) (certifying class of homeless people living on the public streets in Miami, finding Rule 23(a)(1) satisfied after drawing reasonable inferences from studies conducted of homeless population); *Lewis v. Gross,* 663 F.Supp. 1164, 1169 (E.D.N.Y. 1986) (certifying class of resident aliens denied Medicaid coverage because of their alienage, finding Rule 23(a)(1) satisfied by census figures).

Moreover, this case bears other indicia that joinder would be impracticable. Class members are located throughout a number of counties and might be difficult to locate, *see Metts,* 1997 WL 688804, at \*3, and because of their limited financial resources, class members might be unlikely to institute individual actions.

### 2. Commonality

■ Commonality is easily established in cases seeking injunctive relief. *See Baby Neal v. Casey,* 43 F.3d 48, 57 (3d Cir.1994). To satisfy the commonality requirement, Plaintiffs must demonstrate that the named plaintiffs and the proposed class share "at least one question of fact or law." *Id.* at 56. "[T]he alleged existence of common discriminatory practices" satisfies the commonality requirement. *Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439, 448 (N.D.Cal.1994).

■ Defendants contend that a mobility- or visually-impaired Medical Assistance recipient would not be a class member unless he or she had suffered actual injury, and that to establish commonality, the Court would need to make factual determinations regarding each putative class member's impairment

and ability to obtain medical care through HealthChoices. The Court rejects this argument. "[C]lass members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are subject to the same harm will suffice." *Baby Neal*, 43 F.3d at 56. Because Plaintiffs request only declaratory and injunctive relief against Defendants for engaging in a common course of conduct, individualized determinations are unnecessary. *See id.* at 56–57.

### 3. Typicality

"The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal*, 43 F.3d at 57. Defendants contend that Plaintiffs' claims are not typical because the facts required to prove them would differ markedly from the facts required to prove the claims of other class members. Again, the Court rejects Defendants' argument. "Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Baby Neal*, 43 F.3d at 58 (quotation and alteration omitted).

### 4. Adequacy of Representation

"Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to the class." *Weiss v. York Hosp.*, 745 F.2d 786, 811 (3d Cir.1984) (quotation omitted). Both factors are present here.

### B. The Requirements of Rule 23(b)

In addition to satisfying the prerequisites of Rule 23(a), a putative class action must fall within a provision of subsection (b). Rule 23(b)(2) provides that a class action may be maintained if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." "[T]his requirement is almost automatically satisfied in actions primarily seeking injunctive relief." *Baby Neal*, 43 F.3d at 58. Plaintiffs here seek broad declaratory and injunctive relief for Defendants' alleged failure to comply with the ADA. This action therefore falls squarely within the confines of Rule 23(b)(2).

Plaintiffs have sustained their burden of satisfying the requirements of Fed.R.Civ.P. 23. Accordingly, the Court will certify the proposed class.

## II. Plaintiffs' Summary Judgment Motion

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Plaintiffs bring this action under Title II of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A primary aim of Title II is to extend the general prohibitions against discrimination established by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1985 & Supp.1997) ("Section 504"). *See* 28 C.F.R. Pt. 35, App. A at 466 (1997). Accordingly, "[t]he law developed under section 504 of the Rehabilitation Act is applicable to Title II of the ADA." *Helen L. v. DiDario*, 46 F.3d 325, 330 n. 7 (3d Cir.1995).[7]

---

7. "Because Title II was enacted with broad language and directed the Department of Justice to promulgate regulations ..., the regulations which the Department promulgated are entitled to substantial deference.... Moreover, because Congress mandated that the ADA regulations be patterned after the section 504 coordination regulations, the former regulations have the force of

Title II requires that qualified individuals with a disability be afforded an opportunity to benefit from and participate in public programs that is both meaningful and equal to the opportunity afforded people without disabilities. *See* 28 C.F.R. § 35.130(b)(1)(ii) (1997); *Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Plaintiffs argue that Defendants are violating Title 11 because the opportunity to participate in and benefit from HealthChoices is not equally available to disabled and non-disabled people.[8]

## A. Physical Access to Providers' Offices

The inability of people with mobility impairments to visit all health care providers that those without such impairments are able to visit certainly reveals some degree of inequality. The question presented, however, is whether this inequality is a harm Title II seeks to redress. Under Title 11, each *facility* need not be accessible; rather, each *program* must be accessible. 28 C.F.R. § 35.150(a)(1) (1997). Consequently, a public entity must make whatever modifications are necessary to ensure that its *programs* are accessible, unless the head of the public entity certifies that the modification fundamentally would alter the nature of the program or would be unduly burdensome to the public entity. 28 C.F.R. § 35.150(a)(3) (1997).

Plaintiffs assert that HealthChoices cannot be an accessible program unless, *inter alia,* individuals with mobility impairments have physical access to the office of *every* participating health care provider. Defendants respond that HealthChoices is in fact an accessible program because it "provides for the ready availability of medical services at numerous alternate accessible sites." (Defs.' Cross–Mot. Partial Summ. J. at 11.) The

applicable regulations do not define "program accessibility" in terms of a required number or percentage of accessible facilities, but do set forth specific minimum requirements regarding the extent to which certain facilities must ·be accessible to individuals with mobility impairments. *See* 28 C.F.R. §§ 35.149–35.151 (1997) (entitled "Subpart D—Program Accessibility," effectuating Part A of Title II); 42 C.F.R. §§ 84.21—84.30 (1997) (entitled "Subpart C—Program Accessibility," effectuating Section 504).[9]

Accordingly, the Court must determine whether, despite its inclusion of a number of health care providers who practice in inaccessible facilities, HealthChoices is an accessible program, and if not, whether requiring *every* participating provider to practice in an accessible office is necessary to ensure the accessibility of the HealthChoices program. Whether HealthChoices is an accessible program partly depends on whether Defendants have complied with the program accessibility regulations, 28 C.F.R. §§ 35.149—35.151 and 42 C.F.R. §§ 84.21—84.30.

For the reasons discussed below in Part II.A.1–2, the Court concludes as a matter of law that HealthChoices is inaccessible, not because the program allows some participating providers to practice in inaccessible facilities, but because it does not comply with the minimum program accessibility regulations promulgated under Title II and Section 504. Pursuant to those regulations, unless they prove that the "undue burden" or "fundamental alteration" exception applies, Defendants must establish and enforce the following guidelines regarding provider participation in HealthChoices:

(1) a provider who practices in an office constructed after the ADA's effective date

---

law." *Helen L. v. DiDario,* 46 F.3d 325, 331–32 (3d Cir.1995).

8. Defendants do not dispute that HealthChoices is a "program" or that DPW is a "public entity" for purposes of the ADA. *Cf.* 28 C.F.R. § 35.190(b)(3) (1997) (designating the Department of Health and Human Services as agency responsible for implementing Title II compliance procedures applicable to all programs "relating to the provision of· health care and social services, ... including the operation of health care and social service providers").

9. The Supreme Court has recognized 45 C.F.R. part 84, (the regulations promulgated by the Department of Health and Human Services pursuant to Section 504), "as an important source of guidance on the meaning of § 504." *Alexander v. Choate,* 469 U.S. 287, 304 & n. 24, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (holding that 14–day limitation on inpatient hospital stays does not deny disabled individuals meaningful access to Medicaid services). This Court therefore considers those regulations as an important source of guidance on the meaning of Title II.

("new construction") must ensure that his or her office is readily accessible to and usable by disabled individuals; [10]

(2) a provider who practices in an office, which, since the ADA's effective date, has been altered in a manner that affects or could affect the usability of the facility, must ensure that the altered portions of the office are, to the maximum extent feasible at the time of the alterations, readily accessible to and usable by disabled individuals; [11]

(3) a provider who practices in an office constructed before the ADA's effective date ("existing facility") and whose practice comprises fifteen or more employees must either (a) ensure that his or her office is accessible to disabled individuals, or (b) arrange to provide disabled individuals with the same medical services ordinarily rendered in the provider's office at an alternative, accessible location selected by the provider; and

(4) a provider who practices in an existing facility and whose practice comprises fewer than fifteen employees may refer disabled individuals to another, accessible provider if, after consulting with the person seeking his or her services, the provider determines that he or she cannot accommodate the individual in his or her office without making significant alterations.

### 1. New Construction

■ "The overall policy of the ADA is to require relatively few changes to existing buildings, but to impose extensive design requirements when buildings are modified or replaced." *Coalition of Montanans Concerned with Disabilities v. Gallatin Airport Auth.*, 957 F.Supp. 1166, 1168 (D.Mont.1997). The program accessibility regulations therefore impose more demanding requirements on "new construction" than on "existing facilities." *See Kinney v. Yerusalim*, 812 F.Supp. 547, 549 (E.D.Pa.), *aff'd*, 9 F.3d 1067

(3d Cir.1993). Pursuant to the regulations, any facility constructed after the effective date of the ADA (January 26, 1992) must be "readily accessible to and usable by individuals with disabilities." 35 C.F.R. § 35.151(a). Similarly, any alteration "that affects or could affect the usability of the facility," if commenced after the ADA's effective date, must "to the maximum extent feasible, be [made] in such a manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities." 35 C.F.R. § 35.151(b). Because "architectural barriers can be avoided at little or no cost" during the construction or alteration of buildings, 28 C.F.R. Pt. 35, App. A at 486, the provisions applicable to new construction and alterations do not provide an undue burden defense, *Kinney v. Yerusalim*, 9 F.3d 1067, 1071 (3d Cir.1993).

■ Plaintiffs argue that every participating provider practices in a "new facility" because the facility is part of HealthChoices, which is a "new" program. In the alternative, Plaintiffs argue that even if the advent of HealthChoices did not render existing provider offices "new" in 1997, the new construction provisions apply to the offices of all providers who first enrolled in the Medical Assistance Program after the ADA's effective date. Plaintiffs contend that this interpretation is supported by the "site selection" provision, 28 C.F.R. § 35.130(b)(4) (1997), which states that a public entity may not select a site or location for a facility if that selection effectively would exclude people with disabilities from the benefits of the entity's program.

The Court disagrees. The regulation applicable to new buildings, 28 C.F.R. § 35.151(a), pertains only to facilities "constructed" after January 26, 1992; its plain language is unambiguous. *Cf.* 28 C.F.R. Pt. 35, App. A at 486 ("Existing buildings leased by the public entity after the effective date of this part are not required by the regulation

---

10. The effective date of the ADA is January 26, 1992.

11. The maximum extent to which a particular facility could have been made accessible during alterations will depend on facts that vary from

case to case. These facts are not part of this record, and whether Defendants have complied with the regulations pertaining to altered facilities therefore is not an appropriate subject for summary judgment at this time.

to meet accessibility standards simply by virtue of being leased."); WEBSTER'S NEW COLLEGIATE DICTIONARY 241 (1981) (defining "construct" as "to make or form by combining parts: BUILD"). The Court therefore finds that the date the public entity first leased, purchased, occupied, or otherwise began using the facility is irrelevant.

 The Court also disagrees with Plaintiffs' interpretation of the "site selection" provision, 28 C.F.R. § 35.130(b)(4), which is found under "Subpart B—General Requirements," not under "Subpart D—Program Accessibility." The site selection provision prohibits public entities from selecting sites that effectively exclude disabled individuals from the entity's *program*, when the *program* is viewed *in its entirety. See* 28 C.F.R. §§ 35.130(b)(4), 35.150(a)(1). This provision thus would prohibit a public entity from selecting inaccessible sites for every facility in which it operated a particular program, because such selections effectively would exclude disabled individuals. Nevertheless, the provision would allow the entity to include in its program some inaccessible existing facilities, i.e., facilities contracted before the ADA's effective date, so long as the inclusion of the inaccessible sites did not have the purpose or effect of denying disabled individuals an opportunity to benefit from the *program.* Contrary to Plaintiffs' suggestion, the selection of an existing facility for inclusion in a public program does not render the facility "new construction."

## 2. Existing Facilities

 Whereas new construction must be readily accessible, existing facilities need only be operated "so that the service, program or activity [inside], when viewed in its entirety," is readily accessible. 28 C.F.R. § 35.150(a). As noted above, this mandate does not "[n]ecessarily require a public entity to make each of its existing facilities accessible . . . . where other methods are effective in achieving compliance with [the ADA]." 28 C.F.R. §§ 35.150(a)(1), (b)(1). Accordingly, the regulations require public entities to provide equivalent services to all program bene-

ficiaries, but permit entities to comply with this requirement in a variety of ways, including home visits and the delivery of services at alternative accessible sites. 28 C.F.R. § 35.150(b)(1); 28 C.F.R. Pt. 35, App. A at 484. The regulations applicable to "existing facilities" therefore require that health care providers who participate in a public entity's program either accommodate disabled individuals in their offices or provide their services at an alternative, accessible site. *See* 28 C.F.R. Pt. 35, App. A at 484.

Title II does allow referrals, but only in limited circumstances. A provider whose practice comprises fewer than fifteen employees may refer disabled individuals to another, accessible provider if, after consulting with the person seeking his or her services, the provider determines that he or she cannot accommodate the individual in his or her office without making significant alterations. *See* 45 C.F.R. § 84.22(c). The referring provider "has the responsibility of determining that the other provider is in fact accessible and willing to provide the service." 45 C.F.R. Pt. 84, App. A at 341.

In sum, Defendants need not require that *every* provider who participates in Health-Choices practice in an accessible facility so long as Defendants ensure that every provider complies with the above-described regulations applicable to "new construction" and "existing facilities" and thereby confer upon disabled individuals a meaningful opportunity to benefit from and participate in the mandatory managed care program.

## B. Communications

 The Title 11 regulations require public entities to "take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a) (1997). The regulations further require the public entity to "furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of," the entity's program.[12] 28 C.F.R.

12. Auxiliary aids and services include "[q]uali-

fied readers, taped texts, audio recordings,

§ 35.160(b)(1) (1997). "The public entity must provide an opportunity for individuals with disabilities to request the auxiliary aids and services of their choice" and must "honor the choice unless it can demonstrate that another effective means of communication exists or that use of the means chosen" would cause a fundamental alteration of the program or undue financial and administrative burdens. 28 C.F.R. Pt. 35, App. A at 487; *see* 28 C.F.R. § 35.164 (1997). Therefore, "[d]eference to the request of the individual with a disability is desirable," but not absolutely required. 28 C.F.R. Pt. 35, App. A at 487; *see also Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C.Cir.1997) (stating, in dictum, that ADA regulations do not require public entity to honor individual's requested means of communication if another effective means of communication exists).

With respect to the provider directories, Defendants argue that because trained personnel are available to assist HealthChoices enrollees select health care providers, DPW need not require the HMOs to issue provider directories in any alternative format. Plaintiffs assert that the offered assistance and the printed directories are not equally effective means of communication. The Court concludes that whether verbal assistance is a sufficiently effective means of communicating the information contained in the provider directories presents a genuine issue of material fact that must be left to the finder of fact.

With respect to the member handbooks, Defendants argue that because the HMOs maintain copies of their handbooks on audiotape, DPW need not require the HMOs to issue versions in Braille or large print. They contend that audiotape is a sufficiently effective means of communication because it can be used by every visually-impaired person. Plaintiffs contend that for people who can read Braille or large print, audiotape is a less effective means of communication because the listener cannot refer to a table of contents, index, or heading to obtain quickly the information he or she seeks, but instead must

Brailled materials, large print materials, or other effective methods of making visually delivered

review the entire audiotape. Again, the Court concludes that whether audiotape is a sufficiently effective means of communication in this context is a genuine issue of material fact, which must be left to the finder of fact.

## C. Methods of Administration

Title II prohibits a public entity from using methods of administration that have the "effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3) (1997). Plaintiffs argue that Defendants have violated this prohibition by allowing the use of "special needs" identifiers in the provider directories and by allowing the assignment of mobility-impaired individuals to providers whose offices are inaccessible. Defendants have not addressed this argument, but the record indicates that DPW recently has instructed the HMOs to remove references to "special needs" from all future editions of the provider directories, (Resp. of Def. to Pls.' Statement. Uncontested Facts ¶ 117), and has taken steps to prevent HMOs from assigning mobility-impaired individuals to inaccessible providers, (*id.* ¶¶ 126–27).

Plaintiffs also argue that Defendants have violated 28 C.F.R. § 35.130(b)(3) by failing to use methods of administration that would "maximize access to HealthChoices providers by people with mobility impairments." (Pls.' Mo. Summ. J. at 38.) Plaintiffs contend that DPW must "requir[e] the HealthChoices HMOs to use fiscal incentives to [encourage] inaccessible providers to become accessible (e.g., higher payment rates for accessible providers)" and "instruct[ ] providers about the availability of federal tax credits for funds spent to make their facilities accessible." (Pls.' Reply Supp. Mo. Summ. J. at 24.)

Although Plaintiffs view these alleged "failures to maximize accessibility" as violations of 28 C.F.R. § 35.130(b)(3), the Court concludes that the changes sought by Plaintiffs, if required at all, would be required by 28 C.F.R. § 35.130(b)(7), which states: "A public entity shall make reasonable modifications in policies, practices, or procedures when the

materials available to individuals with visual impairments." 28 C.F.R. § 35.104(2) (1997).

modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the program service or activity." The record is not yet sufficiently developed on this issue and thus does not provide an adequate basis for summary judgment.

### III. Defendant's Cross–Motion for Partial Summary Judgment

#### A. Section Five of the Fourteenth Amendment

Defendants argue that the ADA, when directed at unintentional discrimination, is not "appropriate legislation" within Congress' Section Five power "to enforce" by "appropriate legislation" the constitutional guarantee that no State shall deny any person "the equal protection of the laws." U.S. CONST. amend. XIV, §§ 1, 5.[13]

> The Fourteenth Amendment provides, in relevant part,
>
> Section 1.... No State shall ... deny to any person within its jurisdiction the equal protection of the laws.
>
> Section 5.... The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

U.S. CONST. amend. XIV, §§ 1, 5. Congress's power under Section Five extends only to enforcing the provisions of the Fourteenth Amendment, and does not allow Congress to enact "measures that make a substantive change in the governing law." *City of Boerne v. Flores*, —— U.S. ——, ——, 117 S.Ct. 2157, 2164, 138 L.Ed.2d 624 (1997). Congress may enforce a constitutional right by utilizing "measures that remedy or prevent unconstitutional actions," not by altering the meaning of the right itself. *Id.*

Though legislation may not redefine the right to equal protection, "[i]t is for Congress in the first instance to 'determine whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference." *City of Boerne*, —— U.S. at ——, 117 S.Ct. at 2172 (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966)) (alteration omitted). Moreover, Congress's power under Section Five is not limited to proscribing unconstitutional acts. In an effort to remedy or prevent constitutional violations, Congress may enact legislation proscribing conduct that falls beyond the reach of the Fourteenth Amendment's prohibitions. *See City of Boerne*, —— U.S. at ——, 117 S.Ct. at 2163. However, "[w]hile preventative rules are sometimes appropriate remedial measures, there must be a congruence between the means used and the ends to be achieved. The appropriateness of remedial measures must be considered in light of the evil presented." *City of Boerne*, —— U.S. at ——, 117 S.Ct. at 2169.[14]

Defendants' primary argument is that Section Five does not empower Congress to enact legislation prohibiting unintentional discrimination because such conduct falls outside the ambit of the Equal Protection Clause. Citing *City of Boerne v. Flores*, Defendants argue that when applied to unin-

---

**13.** "[T]he action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States," *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 169, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (quotation omitted). Defendants do not dispute that DPW is a state actor for purposes of the Fourteenth Amendment.

**14.** In *City of Boerne*, the Supreme Court examined the relationship between the Religious Freedom Reform Act (RFRA) and the Free Exercise Clause as defined by the Supreme Court in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith,* the Supreme Court held that "generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified by a compelling governmental interest." 494 U.S. at 885–86. Congress passed RFRA in direct response to, *Smith;* the stated purpose of the act was to "restore the compelling interest test ... and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1) (1994). Finding that "RFRA is so out of proportion to a supposed remedial or preventative object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior," Justice Kennedy concluded that RFRA was a congressional attempt to make a "substantive change in constitutional protections" and hence unconstitutional. *City of Boerne*, —— U.S. at ——, 117 S.Ct. at 2170.

tentional discrimination, the ADA lacks "congruence and proportionality" to "the injury to be prevented or remedied." —— U.S. at ——, 117 S.Ct. at 2164. The Court disagrees.

■■■■■ Although Defendants correctly assert that a viable equal protection claim requires an allegation of purposeful or intentional discrimination, *see McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the Supreme Court has made clear that Congress may exercise its Section Five power to prohibit constitutional as well as unconstitutional acts:

> Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'

*City of Boerne,* —— U.S. at ——, 117 S.Ct. at 2163 (quoting *Fitzpatrick v. Bitzer,* 427 U.S. 445, 455, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)).

The ADA is a congruent and proportionate response to unconstitutional discrimination against disabled individuals. The statute reflects due regard for Supreme Court precedent, *see City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), and has ample support in the legislative record, *see* 42 U.S.C. § 12101 (1995). In light of the historical and continuing existence of unfair discrimination against people with disabilities, the ADA is not so sweeping as to exceed the harm it is designed to redress. *See Clark v. California,* 123 F.3d 1267, 1270 (9th Cir.1997), *petition for cert. filed,* 66 U.S.L.W. 3308 (U.S. Oct. 20, 1997) (No. 97–686); *cf. Alexander v. Choate,* 469 U.S. 287, 296–97, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) ("[M]uch of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by discriminatory intent.").

This Court therefore agrees with the majority of courts, including the Seventh and Ninth Circuits, which have held that Title II of the ADA represents a valid exercise of Congress's power pursuant to Section Five of the Fourteenth Amendment. *See Clark,* 123 F.3d at 1270–71; *Crawford v. Indiana Dep't of Corrections,* 115 F.3d 481, 487 (7th Cir. 1997); *Hunter v. Chiles,* 944 F.Supp. 914, 917 (S.D.Fla.1996); *Armstrong v. Wilson,* · 942 F.Supp. 1252, 1260–62 (N.D.Cal.1996), *aff'd,* 124 F.3d 1019 (9th Cir.1997), *petition for cert. filed,* 66 U.S.L.W. 3308 (Oct. 20, 1997); *Niece v. Fitzner,* 941 F.Supp. 1497, 1503–04 (E.D.Mich.1996). *But cf. Garrett v. Board of Trustees,* 989 F.Supp. 1409 (N.D.Ala.1998) (holding that Congress exceeded its Section Five enforcement power in enacting ADA accommodation provisions); *Nihiser v. Ohio E.P.A.,* 979 F.Supp. 1168, 1173 (S.D.Ohio 1997) (same).

## B. Standing

Defendants also argue that DIA lacks standing to bring this action. The Court need not reach this issue because DIA's position in this litigation is identical to that of Plaintiffs Anderson and Garrison, whose standing is unquestioned. *See Bowen v. Kendrick,* 487 U.S. 589, 620 n. 15, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988); *National Fed'n of Fed. Employees v. United States,* 905 F.2d 400, 402 (D.C.Cir.1990).

## CONCLUSION

For all the foregoing reasons, the Court will grant Plaintiffs' Motion for Class Certification, will grant in part and deny in part Plaintiffs' Motion for Summary Judgment, and will deny Defendants' Cross–Motion for Summary Judgment. An Order accompanies this Opinion.

### ORDER

**AND NOW,** this 1st day of April, 1998, upon consideration of Plaintiffs' Motion for Class Certification, Plaintiffs' Motion for Summary Judgment, and Defendants' Cross–Motion for Summary Judgment, and after oral argument on these matters, the Court hereby **ORDERS** that Plaintiffs' Motion for Class Certification is **GRANTED,** Plaintiffs' Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART,** and Defendants' Cross–Motion for Partial Summary Judgment is **DENIED.**

The Court finds that Defendants are in violation of Part A of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134 (1995) ("ADA"), and the regulations promulgated thereunder. Accordingly, it is hereby **ORDERED** that Defendants shall, within sixty (60) days from the date hereof, promulgate and enforce the following requirements, which must be satisfied before a health care provider may participate in HealthChoices:

(1) a provider who practices in an office constructed after January 26, 1992 ("new construction"), must ensure that his or her office is readily accessible to and usable by disabled individuals;

(2) a provider who practices in an office, which, since the ADA's effective date, has been altered in a manner that affects or could affect the usability of the facility, must ensure that the altered portions of the office are, to the maximum extent feasible at the time of the alterations, readily accessible to and usable by disabled individuals;

(3) a provider who practices in an office constructed before the January 26, 1992 ("existing facility") and whose practice comprises fifteen or more employees must either (i) ensure that his or her office is accessible to disabled individuals, or (ii) arrange to provide disabled individuals with the same medical services ordinarily rendered in the provider's office at an alternative, accessible location selected by the provider; and

(4) a provider who practices in an existing facility and whose practice comprises fewer than fifteen employees may refer disabled individuals to another, accessible provider if, after consulting with the person seeking his or her services, the provider determines that he or she is unable to see the individual in his or her office without making significant alterations.