KING, Circuit Judge,
dissenting:
Because I believe that Congress successfully abrogated state sovereign immunity when it enacted Title II of the ADA, I must dissent. My primary disagreement with my friends in the majority relates both to their refusal to give proper credit to specific record evidence of discrimination by state entities in public programs, and to their denial to Congress of the deference due when our elected representatives make general findings of fact in support of legislation. Furthermore, the majority mistakenly asserts that, because Title II reaches certain constitutional conduct, the ADA’s abrogation of immunity must be unsuccessful. Though the majority gives lip service to the notion that § 5 of the Fourteenth Amendment does not require that Congress tailor its legislative remedies with surgical precision, the effect of its decision is to demand just that. I will elaborate briefly on each of these points of disagreement.
*216 I.
The Supreme Court held last year, in Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), that Congress exceeded its enforcement authority under § 5 of the Fourteenth Amendment when it sought to abrogate state sovereign immunity in Title I of the ADA, 42 U.S.C. §§ 12111-12117 (addressing discrimination by employers affecting interstate commerce). In so holding, the Gamtt Court observed that the legislative record of the ADA “fails to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled.” 531 U.S. at 368, 121 S.Ct. 955 (emphasis added). Of significance here, the Court’s Gamtt decision expressly reserved the question of whether Title II, 42 U.S.C. §§ 12181-12165 (addressing discrimination by public entities in the operation of public services), is appropriate legislation under § 5 of the Fourteenth Amendment. Id. at 360 n. 1, 121 S.Ct. 955. The legislative record before us in support of Title II’s abrogation of state sovereign immunity is far stronger than that found wanting by the Garrett Court. Given the strength of this record, a modicum of respect for the workings of the legislative branch of government should prompt us to conclude that Congress’s findings in support of Title II abrogation were sufficient.
A.
1.
The Garrett Court found that Congress had failed to identify a sufficient “pattern” of unconstitutional discrimination to support its § 5 abrogation of state sovereign immunity in Title I of the ADA. See, e.g., Garrett, 531 U.S. at 370, 121 S.Ct. 955 (“[E]ven if it were to be determined that each [record] incident upon fuller examination showed unconstitutional action on the part of the State, these incidents taken together fall far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based.”). While the legislative record supporting Title I failed to establish a pattern of unconstitutional discrimination by the states, no such deficiency exists in the record supporting Title II.
The congressional record supporting abrogation under Title II of the ADA contains abundant evidence of specific acts of unconstitutional state discrimination against the disabled in the operation of public programs. As Justice Breyer observed in his Garrett dissent, “[t]here are roughly 300 examples of discrimination by state governments themselves in the legislative record [of the ADA].” Garrett, 531 U.S. at 379, 121 S.Ct. 955 (Breyer, J., dissenting). And according to the Gamtt majority itself, “[t]he overwhelming majority of these accounts pertain to alleged discrimination by the States in the provision of public services and public accommodations, which areas are addressed in Titles II and III of the ADA.” Garrett, 531 U.S. at 370 n. 7, 121 S.Ct. 955 (emphasis added) (Rehnquist, C.J.). In other words, the Garrett Court specifically found that the overwhelming majority of Congress’s specific evidence of discrimination failed to uphold the Title I abrogation simply because it supported abrogation in Titles II and III of the ADA instead.[1]
*217 The congressional record supporting abrogation under Title II is stronger still by ■virtue of the fact that Title II implicates constitutional rights that trigger heightened judicial scrutiny. While Title I dealt only with employment discrimination, Title II addresses discrimination impheating, inter alia, parental rights, voting rights, and the Eighth Amendment right against cruel and unusual punishment.[2] Whereas a state is constitutionally entitled to engage in “rational” employment discrimination on the basis of disability, a state’s infringement of a disabled person’s parental, voting, or Eighth Amendment rights is subjected to more searching scrutiny.
Instances in which states denied to the disabled certain fundamental rights are recounted throughout the legislative record underlying Title II. Held to the appropriate, higher levels of scrutiny, such discrimination is clearly unconstitutional. For instance, Congress heard that a blind voter with cerebral palsy was arbitrarily refused the right to register to vote in state elections. Staff of the House Comm, on Educ. and Labor, 101st Cong., 2d Sess., 2 Legis. Hist, of Pub.L. No. 101-336: The Americans with Disabilities Act 1220, 100th Cong., 2d Sess. (Comm. Print 1990) [hereinafter “Leg. Hist.”]. It heard that a blind woman was refused instructions on how to use her state’s voting machines. Task Force on the Rights and Empowerment of Americans with Disabilities, Alabama Submissions 16.[3] It heard that state mental hospitals misuse medications to punish and restrain their disabled, institutionalized patients. 2 Leg. Hist. 1203, 1262-63. And it heard that such hospitals subject their patients to abusive treatment and inhumane conditions.[4] Id. Replete with such evidence of unconstitutional state discrimination, the congressional record underlying Title II of the ADA provides more than adequate support for Congress’s abrogation of state sovereign immunity under § 5 of the Fourteenth Amendment.
2.
In addition to amassing specific evidence in support of the Title II abrogation, Congress made an express general finding that the states had engaged in a pattern of unconstitutional discrimination in the operation of public services. In rejecting Congress’s Title I' abrogation, the Garrett Court relied heavily on the fact that Congress’s record failed to conclude that state employment practices demonstrated a pattern of discrimination against the disabled. Relying on Senate and House committee reports as indicative of Congress’s judgment regarding general patterns of discrimination, Chief Justice Rehnquist explained that “had Congress *218 truly understood [the evidence] as reflecting a pattern of unconstitutional behavior by the States, one would expect some mention of that conclusion in the Act’s legislative findings. There is none.” Garrett, 531 U.S. at 370-72, 121 S.Ct. 955. Strikingly, there is such a finding with respect to the public services governed by Title II. The very Senate report relied upon by the Chief Justice concluded that “[discrimination still persists in such critical areas as employment in the private sector, public accommodations, public services, transportation, and telecommunications.” S.Rep. No. 101-116, p. 6 (1989) (emphasis added); see Garrett, 531 U.S. at 371, 121 S.Ct. 955. And the House report on which Chief Justice Rehnquist relied reached the same conclusion: “After extensive review and analysis over a number of Congressional sessions, ... [we find that] there exists a compelling need to establish a clear and comprehensive Federal prohibition of discrimination on the basis of disability in the areas of employment in the private sector, public accommodations, public services, transportation, and telecommunications.” H.R.Rep. No. 101-485, pt. 2, p. 28 (1990) (emphasis added); see Garrett, 531 U.S. at 371, 121 S.Ct. 955.
Thus, while Congress made no mention at all of the public sector in its finding of persistent employment discrimination, it expressly concluded that there existed a pattern of discrimination in public services for Congress to remedy through § 5 abrogation of state sovereign immunity. Given that the Ganrett majority characterized Congress’s failure to make a general finding of public sector employment discrimination as “strong evidence” of “that body’s judgment that no pattern of unconstitutional state action had been documented,” Garrett, 531 U.S. at 371, 121 S.Ct. 955, we must take Congress’s finding of public services discrimination as compelling evidence of its judgment that a pattern of unconstitutional conduct was documented for Title II.
B.
Both Congress’s specific findings and its general conclusion of rampant discrimination in public services should satisfy this Court that our elected representatives did indeed identify a pattern of unconstitutional state action that justified abrogation of state sovereign immunity with respect to Title II of the ADA. Instead, the majority transforms what is properly a factual question within Congress’s purview into a legal question for this Court’s determination. And beyond merely trespassing on Congress’s proper fact-finding role, the majority establishes and applies a standard of review that even a detailed legislative record could not possibly satisfy. It is, in my view, inappropriate for the unelected judiciary to so interfere with a coequal branch of government.
The Supreme Court has recognized that “Congress may paint with a much broader brush than may this Court, which must confine itself to the judicial function of deciding individual cases and controversies upon individual records.” Oregon v. Mitchell, 400 U.S. 112, 284, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (Stewart, J., concurring in part and dissenting in part). It is uniquely Congress’s role to draw general conclusions from anecdotal evidence gathered from a broad swath of the population, and its design — unlike that of the federal courts — suits it for this function. Accordingly, the federal courts are not then to “sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations.” Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 *219 (1993) (quoting New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam)); see also FCC v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (emphasizing that it is not for the courts “to judge the wisdom, fairness, or logic of legislative choices”). Congress’s judgment that a pattern of state discrimination persists, and that such discrimination requires a federal remedy, is entitled to “a great deal of deference, inasmuch as Congress is an institution better equipped to amass and evaluate the vast amounts of data bearing on such an issue.” Walters v. Nat’l Ass’n of Radiation Survivors, 473 U.S. 305, 331 n. 12, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985).
In the § 5 context, the Supreme Court has specifically admonished that “[i]t [i]s for Congress ... to assess and weigh the various conflicting considerations — the risk or pervasiveness of the discrimination in governmental services, ... the adequacy or availability of alternative remedies, and the nature and significance of the state interests that would be affected.... It is not for us to review the congressional resolution of these factors.” Katzenbach v. Morgan, 384 U.S. 641, 653, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); see also Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank, 527 U.S. 627, 639, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (stating that “Congress must have wide latitude”) (quoting City of Boerne v. Flores, 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)); City of Boerne, 521 U.S. at 528, 536, 117 S.Ct. 2157 (reaffirming Morgan and adding that Congress’s “conclusions are entitled to much deference”). Rather, “[i]t is enough that we be able to perceive a basis upon which the Congress might resolve the conflict as it did.” Morgan, 384 U.S. at 653, 86 S.Ct. 1717; see also City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 441, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (“[Cjourts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices [under § 5 of the Fourteenth Amendment].”).
Our deference to Congress’s assessment of the problems facing this nation is particularly appropriate when the problems are those of a “large and diversified group,” such as the disabled. See Cleburne, 473 U.S. at 442, 105 S.Ct. 3249. Addressing discrimination against the disabled, as Congress did in the ADA, “is a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary.” Id. at 442-43, 105 S.Ct. 3249. The drafting of the ADA is itself a case study in the sort of exhaustive, nationwide fact-finding for which Congress is uniquely suited.[5]
*220 In view of the substantiality of the Title II record showing unconstitutional state discrimination, a modicum of respect for Congress should compel the conclusion that Congress built a record adequate to support abrogation of sovereign immunity in Title II of the ADA.
II.
The majority also maintains, in support of its conclusion that Congress did not validly abrogate immunity under Title II, that “[e]ven if Congress had had before it an adequate record of unconstitutional state conduct,” the Title II abrogation would be improper because it “impose[s] a remedy that is neither congruent nor proportional to the problem [Congress] identified.” Ante at 213, 215 (citing City of Boerne, 521 U.S. at 520, 117 S.Ct. 2157). The majority’s interpretation of congruence and proportionality in effect requires that Congress’s remedy be a perfect fit, prohibiting only such conduct as is itself unconstitutional. The Supreme Court, though, has repeatedly recognized that such precision in statutory tailoring is not required when Congress legislates under § 5 of the Fourteenth Amendment.
A.
Title II of the ADA mandates that a state make “reasonable modifications” to its policies and practices to accommodate the disabled. 42 U.S.C. § 12131(2). The majority contends that this requirement lacks the congruence and proportionality required of legislation under § 5 of the Fourteenth Amendment. Ante at 214. It takes as its example the possibility that, under the ADA, a state might “be required to locate or create accessible polling places for all citizens, irrespective of inconvenience and expense.” Ante at 214. While I would dispute the majority’s characterization of what the ADA requires,[6] the majority is nonetheless correct that certain discriminatory state action may be unreasonable under the ADA, and yet constitutional. That fact, though, does not render Title II’s abrogation of sovereign immunity improper.
As the majority concedes, the “congruence and proportionality” requirement of § 5 may be satisfied by legislation that reaches plainly constitutional conduct, provided that “there is reason to believe that many of the laws affected by the congressional enactment have a significant likeli *221 hood of being unconstitutional.” City of Boerne, 521 U.S. at 532, 117 S.Ct. 2157. Ante at 214. The Supreme Court has held that “[ljegislation which deters or remedies constitutional violations can fall within the sweep of Congress’ [§ 5] enforcement power even if in the process it prohibits conduct which is not itself unconstitutional .." Florida Prepaid, 527 U.S. at 638, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (quoting City of Boerne, 521 U.S. at 518, 117 S.Ct. 2157) (emphasis added); cf. Katzenbach, 383 U.S. at 324, 86 S.Ct. 803, (interpreting the similarly worded Enforcement Clause of the Fifteenth Amendment to permit Congress to use “any rational means to effectuate the constitutional prohibition”). Under Supreme Court precedent, § 5 legislation is appropriately “congruent and proportional” if it is “responsive to, or designed to prevent, unconstitutional behavior.” City of Boerne, 521 U.S. at 532, 117 S.Ct. 2157.
Title II is both responsive to and designed to prevent a congressionally identified pattern of constitutional violations in the operation of public programs. By requiring “reasonable modifications” in policies and practices, Title II charges the states with an affirmative duty to address the sources of discrimination against the disabled in the operation of their public programs. Cf. Green v. County Sch. Bd., 391 U.S. 430, 437-38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) (stating that after unconstitutional segregation, government is “charged with the affirmative duty to take whatever steps might be necessary” to eliminate discrimination). Congress could reasonably have concluded that a statutory regime that reaches certain constitutional conduct is necessary both to root out unconstitutional conduct that would otherwise escape detection, and to deter future constitutional violations.
B.
While the Garrett Court indicated in dicta that the breadth of rights and remedies created under Title I “would raise ... concerns about congruence and proportionality,” Garrett, 531 U.S. at 372, 121 S.Ct. 955, Title II averts such concerns by departing from Title I in two important respects: first, Title II requires more limited accommodation of the disabled; and second, it targets discrimination by public entities acting not as employers, but rather as sovereigns. As explained below, due to these two distinctions, Title II interferes with “rational” (and therefore constitutional) discrimination against the disabled to a lesser degree than did Title I. Accordingly, the remedy that Title II provides is more closely tailored to its goal of eliminating unconstitutional discrimination than was the remedy under Title I, and its § 5 abrogation is entirely proper. I address these distinctions in turn.
1.
Whereas Title I expressly requires modification of existing, inaccessible facilities to accommodate the disabled, see 42 U.S.C. § 12112(b)(5)(A); Garrett, 531 U.S. at 372, 121 S.Ct. 955, Title II does not. Rather, Title II requires only that public entities make their programs accessible. 42 U.S.C. § 12132. This requirement is satisfied if, for instance, a state offers a program in an alternate setting to individuals who are unable to use an existing facility. 28 C.F.R. § 35.150(b)(1); see Anderson v. Pa. Dep’t of Pub. Welfare, 1 F.Supp.2d 456, 464 (“The overall policy of [Title II of] the ADA is to require relatively few changes to existing buildings .... ” (citation omitted)). As a result, Title II requires that the states make fewer affirmative accommodations than did Title I; and the prophylactic scope of Title II imposes a minimal burden because, as Congress found, the vast majority of the those ac *222 commodations entail little or no cost.[7] By demanding that the states make fewer and less burdensome accommodations, Title II interferes in constitutional state discrimination against the disabled to a lesser degree than did Title I.[8]
2.
In finding that Congress did not validly abrogate sovereign immunity in Title I, the Garrett Court emphasized that Title I requires that employers make existing facilities accessible to the disabled, even though “it would be entirely rational (and therefore constitutional) for a state employer to conserve scarce financial resources by hiring employees who are able to use existing facilities.” Garrett, 531 U.S. at 372, 121 S.Ct. 955. The Supreme Court has held, though, that while a state has a “significant” interest in conserving resources and achieving its goals as effectively and efficiently as possible when it acts as an employer, that same interest in efficiency is “relatively subordinate” when the state acts in its sovereign capacity by, for instance, operating public programs. See Board of County Comm’rs v. Umbehr, 518 U.S. 668, 676, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). As a result, the scope of a state’s legitimate interest in maximizing efficiency in the operation of its public programs is narrower than the scope of its legitimate interest in maximizing efficiency as an employer. Since Title II — with remedial provisions no broader than those of Title I — addresses discrimination by states in their operation of public programs, whereas Title I addressed discrimination by states acting as employers, Title II necessarily intrudes less on the states’ rational pursuit of legitimate interests. Hence, Title II interferes in constitutional state discrimination against the disabled to a lesser degree than did Title I.
C.
Even though Title II reaches certain constitutional conduct, it constitutes a rational effort to remedy and deter identified constitutional violations, and it is an effort that is better tailored to address unconstitutional conduct than was Title I. Unless we intend to demand a perfect statutory fit, rather than the “congruence and proportionality” required by the Supreme Court, Title II’s abrogation of state sovereign immunity remains well within Congress’s § 5 authority.
III.
For the foregoing reasons, I see Title II’s abrogation of sovereign immunity as passing constitutional muster. I respectfully dissent.

. The majority insists that "the Supreme Court simply noted that the vast majority of the claimed acts of discrimination listed in Appendix C were irrelevant to the only question before the Court, namely, the validity of abrogation under Title I of the ADA.” Ante at 213 n. 9. This is incorrect. In light of the fact that the Chief Justice stated baldly that the evidence in Appendix C "pertain[s] to alleged discrimination by the States in the ... areas *217 ... addressed in Titles II and III of the ADA,” Garrett, 531 U.S. at 370 n. 7, 121 S.Ct. 955, the majority’s suggestion that the Court confined its discussion to Title I is mistaken.

.See, e.g., Popovich v. Cuyahoga County Ct. of Common Pleas, 276 F.3d 808, 813 (6th Cir.2002) (en banc) (upholding Title II as applied in a case involving parental rights); id. at 820 (Moore, J., concurring) (discussing the implication of voting rights); Kiman v. N.H. Dep't of Corrs., 301 F.3d 13, No. 02-1099 (1st Cir. Aug. 20, 2002) (upholding Title II as applied in a case involving cruel and unusual punishment).

. The Task Force's state-by-state submissions, evincing discrimination in all aspects of the lives of the disabled, 2 Leg. Hist. 1324-25, are part of the official legislative history of the ADA, see id. at 1336, 1389.

. The Supreme Court held in Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), that there are’constitutionally protected liberty interests under the due process clause of the Fourteenth Amendment in reasonably safe conditions of confinement, freedom from unreasonable bodily restraints, and such minimally adequate training as reasonably might be required by these interests.

. In its development of the ADA, Congress created a special task force, which conducted public hearings in every state. Those hearings were attended by more than 30,000 people, including thousands who had experienced discrimination first hand. See Task Force on the Rights and Empowerment of Americans with Disabilities, From ADA to Empowerment 16 (Oct. 12, 1990) (hereinafter Task Force Report). The House of Representatives held eleven hearings, the Senate held three, and both houses of Congress engaged in lengthy floor debates. See Timothy M. Cook, The Americans with Disabilities Act: The Move to Integration, 64 Temp. L.Rev. 393, 393-94 (1991) (summarizing the fact-finding process that preceded passage of the ADA). Only upon conclusion of this thorough process did Congress pass the Americans with Disabilities Act of 1990, which the first President Bush then signed into law.

. By positing that the state’s obligation exists "irrespective of inconvenience and expense,” the majority indulges an alarmist statutory interpretation, indicating that it overestimates the degree to which Title II's requirements reach beyond those imposed by the Constitution. Title II does not require that a state make accommodations irrespective of inconvenience and expense. See Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 603-04, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (holding that a state may take into account cost and available resources in determining whether and how to accommodate the disabled under Title II). Furthermore, Title II's requirement that public entities make "reasonable modifications” to accommodate the disabled, 42 U.S.C. § 12131(2), obliges states only to make their programs accessible. 28 C.F.R. § 35.150(b)(1) (stating that when existing facilities are inaccessible, a public entity "is not required to make structural changes,” so long as it makes its programs available to the disabled in some other manner); see also Anderson v. Pa. Dep’t of Pub. Welfare, 1 F.Supp.2d 456, 464 ("The overall policy of [Title II of] the ADA is to require relatively few changes to existing buildings .... ” (citation omitted)). Thus, far from requiring that the state “locate or create accessible polling places for all citizens, irrespective of inconvenience and expense,” as the majority fears, ante at 214, Title II apparently demands nothing more than provision of an absentee ballot alternative. Cf. Dipietrae v. City of Phila., 666 A.2d 1132 (Pa.Commw.), aff'd, 543 Pa. 591, 673 A.2d 905 (1995) (discussing absentee ballots as an ADA-satisfying option for disabled voters who cannot go to the polls).

. See S.Rep. No. 116, 101st Cong., 1st Sess., 10-12, 89, 92 (1989); H.R.Rep. No. 485, 101st Cong., 2d Sess., Pt. 2, at 34 (1990).

. The majority responds to this argument by stating that “the mere fact that some accommodations may be accomplished at little or no cost ... does not establish that, as a whole, Title II requires little more of the states than does the Constitution.” Ante at 214 n. 11. Clearly not. What it does establish, though, is that, by both imposing fewer costs and demanding fewer accommodations, Title II raises fewer congruence and proportionality concerns than did Title I. See City of Boerne, 521 U.S. at 534, 117 S.Ct. 2157 (congruence and proportionality concerns are most acute when statutory compliance entails "substantial costs” that “far exceed any pattern or practice of unconstitutional conduct”); Garrett, 531 U.S. at 372, 121 S.Ct. 955 (noting that congruence and proportionality is of particular concern under Title I because "the [Title I] accommodation duty far exceeds what is constitutionally required”).