# FLORIDA PREPAID POSTSECONDARY EDUCATION EXPENSE BOARD *v.* COLLEGE SAVINGS BANK ET AL.

No. 98–531.   Argued April 20, 1999—Decided June 23, 1999

628

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 648.

*Jonathan A. Glogau*, Assistant Attorney General of Florida, argued the cause for petitioner. With him on the briefs were *Louis F. Hubener*, Assistant Attorney General, *Anne S. Mason, Joseph C. Mason, Jr., William B. Mallin, Lewis F. Gould, Jr.*, and *Joseph M. Ramirez.*

*Kevin J. Culligan* argued the cause for respondent College Savings Bank. With him on the brief were *Steven C. Cherny* and *Robert W. Morris.*

*Solicitor General Waxman* argued the cause for the United States, respondent under this Court's Rule 12.6, urging affirmance. With him on the brief were *Acting Assistant Attorney General Ogden, Deputy Solicitor General Wallace, Paul R. Q. Wolfson*, and *Mark B. Stern.**

*Briefs of *amici curiae* urging reversal were filed for the State of Ohio et al. by *Betty D. Montgomery*, Attorney General of Ohio, *Edward B. Foley*, State Solicitor, and *Elise W. Porter*, Assistant Solicitor, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *M. Jane Brady* of Delaware, *Margery S. Bronster* of Hawaii, *James E. Ryan* of Illinois, *Jeffrey A. Modisett* of Indiana, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.*, of Maryland, *Jennifer M. Granholm* of Michigan, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *Patricia A. Madrid* of New Mexico, *Eliot Spitzer* of New York, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Sheldon Whitehouse* of Rhode Island, *Charles M. Condon* of South Carolina, *Jan Graham* of Utah, *Mark L. Earley* of Virginia, and *Gay Woodhouse* of Wyoming; for the National Con-

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In 1992, Congress amended the patent laws and expressly abrogated the States' sovereign immunity from claims of patent infringement. Respondent College Savings then sued the State of Florida for patent infringement, and the Court of Appeals held that Congress had validly abrogated the State's sovereign immunity from infringement suits pursuant to its authority under § 5 of the Fourteenth Amendment. We hold that, under *City of Boerne* v. *Flores,* 521 U. S. 507 (1997), the statute cannot be sustained as legislation enacted to enforce the guarantees of the Fourteenth Amendment's Due Process Clause, and accordingly reverse the decision of the Court of Appeals.

I

Since 1987, respondent College Savings Bank, a New Jersey chartered savings bank located in Princeton, New Jersey, has marketed and sold certificates of deposit known as the CollegeSure CD, which are essentially annuity contracts for financing future college expenses. College Savings obtained

ference of State Legislatures et al. by *Richard Ruda* and *James I. Crowley;* and for the Regents of the University of California by *Charles A. Miller, Caroline M. Brown, Jason A. Levine, Gerald P. Dodson, James E. Holst, P. Martin Simpson, Jr.,* and *Richard L. Stanley.*

Briefs of *amici curiae* urging affirmance were filed for the American Society of Composers, Authors, and Publishers et al. by *Michael R. Klipper;* for the Association of American Publishers, Inc., et al. by *Charles S. Sims;* for the Association of American Railroads by *Betty Jo Christian* and *Shannen W. Coffin;* for the Federal Circuit Bar Association by *George E. Hutchinson* and *William M. Atkinson;* for the New York Intellectual Property Law Association by *Charles P. Baker, Bruce M. Wexler,* and *Howard B. Barnaby;* and for the Pacific Legal Foundation by *Eric Grant* and *James S. Burling.*

Briefs of *amici curiae* were filed for the American Intellectual Property Law Association by *Joseph R. Re, Michael K. Friedland,* and *Don W. Martens;* and for the Association of the Bar of the City of New York by *Leon Friedman, Louis A. Craco, Jr.,* and *James F. Parver.*

a patent for its financing methodology, designed to guarantee investors sufficient funds to cover the costs of tuition for colleges. Petitioner Florida Prepaid Postsecondary Education Expense Board (Florida Prepaid) is an entity created by the State of Florida that administers similar tuition prepayment contracts available to Florida residents and their children. See Fla. Stat. § 240.551(1) (Supp. 1998). College Savings claims that, in the course of administering its tuition prepayment program, Florida Prepaid directly and indirectly infringed College Savings' patent.

College Savings brought an infringement action under 35 U. S. C. § 271(a) against Florida Prepaid in the United States District Court for the District of New Jersey in November 1994.[1] By the time College Savings filed its suit, Congress had already passed the Patent and Plant Variety Protection Remedy Clarification Act (Patent Remedy Act), 35 U. S. C. §§ 271(h), 296(a). Before this legislation, the patent laws stated only that "whoever" without authority made, used, or sold a patented invention infringed the patent. 35 U. S. C. § 271(a) (1988 ed.).[2] Applying this Court's decision in *Atas-*

---

[1] College Savings also filed a separate action alleging that Florida Prepaid had made false claims about its own product in violation of the Trademark Act of 1946 (Lanham Act), 15 U. S. C. § 1125(a). The District Court dismissed the Lanham Act suit on Eleventh Amendment grounds, the Third Circuit affirmed, and we granted College Savings' petition in that case on the same day we granted the petition in this case. See 525 U. S. 1063 (1999). The Lanham Act suit is the subject of our opinion in *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd., post,* p. 666.

[2] Section 271 still provides in relevant part:

"(a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

"(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

"(c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture,

*cadero State Hosp.* v. *Scanlon,* 473 U. S. 234, 242–243 (1985), the Federal Circuit had held that the patent laws failed to contain the requisite statement of intent to abrogate state sovereign immunity from infringement suits. See, *e. g.,* *Chew* v. *California,* 893 F. 2d 331 (1989). In response to *Chew* and similar decisions, Congress enacted the Patent Remedy Act to "clarify that States, instrumentalities of States, and officers and employees of States acting in their official capacity, are subject to suit in Federal court by any person for infringement of patents and plant variety protections." Pub. L. 102–560, preamble, 106 Stat. 4230; see also H. R. Rep. No. 101–960, pt. 1, pp. 7, 33 (1990) (hereinafter H. R. Rep.); S. Rep. No. 102–280, pp. 1, 5–6 (1992) (hereinafter S. Rep.). Section 271(h) now states: "As used in this section, the term 'whoever' includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity." Section 296(a) addresses the sovereign immunity issue even more specifically:

> "Any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity, shall not be immune, under the eleventh amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person . . . for infringement of a patent under section 271, or for any other violation under this title."

Relying on these provisions, College Savings alleged that Florida Prepaid had willfully infringed its patent under

---

combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." 35 U. S. C. § 271 (1994 ed. and Supp. III).

§ 271, as well as contributed to and induced infringement. College Savings sought declaratory and injunctive relief as well as damages, attorney's fees, and costs.

After this Court decided *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996), Florida Prepaid moved to dismiss the action on the grounds of sovereign immunity.[3] Florida Prepaid argued that the Patent Remedy Act was an unconstitutional attempt by Congress to use its Article I powers to abrogate state sovereign immunity. College Savings responded that Congress had properly exercised its power pursuant to § 5 of the Fourteenth Amendment to enforce the guarantees of the Due Process Clause in § 1 of the Amendment. The United States intervened to defend the constitutionality of the statute. Agreeing with College Savings, the District Court denied Florida Prepaid's motion to dismiss, 948 F. Supp. 400 (N. J. 1996), and the Federal Circuit affirmed, 148 F. 3d 1343 (1998).

The Federal Circuit held that Congress had clearly expressed its intent to abrogate the States' immunity from suit in federal court for patent infringement, and that Congress had the power under § 5 of the Fourteenth Amendment to do so. *Id.*, at 1347. The court reasoned that patents are property subject to the protections of the Due Process Clause and that Congress' objective in enacting the Patent Remedy Act was permissible because it sought to prevent States from depriving patent owners of this property without due process. See *id.*, at 1349–1350. The court rejected Florida Prepaid's argument that it and other States had not deprived patent owners of their property *without due process*, and refused to "deny Congress the authority to subject all states to suit for patent infringement in the federal courts, regardless of the extent of procedural due process that may exist at any particular time." *Id.*, at 1351. Fi-

---

[3] The District Court concluded that, for purposes of immunity from suit, Florida Prepaid is an arm of the State of Florida, a conclusion the parties did not dispute before either the Federal Circuit or this Court.

nally, the court held that the Patent Remedy Act was a proportionate response to state infringement and an appropriate measure to protect patent owners' property under this Court's decision in *City of Boerne*, 521 U. S., at 519. The court concluded that significant harm results from state infringement of patents, 148 F. 3d, at 1353–1354, and "[t]here is no sound reason to hold that Congress cannot subject a state to the same civil consequences that face a private party infringer," *id.*, at 1355. We granted certiorari, 525 U. S. 1064 (1999), and now reverse.

## II

The Eleventh Amendment provides:

> "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

As the Court recently explained in *Seminole Tribe, supra*, at 54:

> "Although the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, 'we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition . . . which it confirms.' That presupposition, first observed over a century ago in *Hans v. Louisiana*, 134 U. S. 1 (1890), has two parts: first, that each State is a sovereign entity in our federal system; and second, that ' "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." ' *Id.*, at 13 (emphasis deleted), quoting The Federalist No. 81 . . . . For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by

the Constitution when establishing the judicial power of the United States.' *Hans, supra,* at 15."

Here, College Savings sued the State of Florida in federal court, and it is undisputed that Florida has not expressly consented to suit. College Savings and the United States argue that Florida has impliedly waived its immunity under *Parden* v. *Terminal R. Co. of Ala. Docks Dept.,* 377 U. S. 184 (1964). That argument, however, is foreclosed by our decision in the companion case overruling the constructive waiver theory announced in *Parden.* See *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd., post,* p. 666.

College Savings and the United States nonetheless contend that Congress' enactment of the Patent Remedy Act validly abrogated the States' sovereign immunity. To determine the merits of this proposition, we must answer two questions: "first, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,' . . . and second, whether Congress has acted 'pursuant to a valid exercise of power.'" *Seminole Tribe, supra,* at 55. We agree with the parties and the Federal Circuit that in enacting the Patent Remedy Act, Congress has made its intention to abrogate the States' immunity "'unmistakably clear in the language of the statute.'" *Dellmuth* v. *Muth,* 491 U. S. 223, 228 (1989). Indeed, Congress' intent to abrogate could not have been any clearer. See 35 U. S. C. § 296(a) ("Any State . . . shall not be immune, under the eleventh amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court . . . for infringement of a patent").

Whether Congress had the power to compel States to surrender their sovereign immunity for these purposes, however, is another matter. Congress justified the Patent Remedy Act under three sources of constitutional authority: the Patent Clause, Art. I, § 8, cl. 8; the Interstate Commerce Clause, Art. I, § 8, cl. 3; and § 5 of the Fourteenth Amend-

ment.  See S. Rep., at 7–8; H. R. Rep., at 39–40.[4]  In *Seminole Tribe*, of course, this Court overruled the plurality opinion in *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1 (1989), our only prior case finding congressional authority to abrogate state sovereign immunity pursuant to an Article I power (the Commerce Clause).  517 U. S., at 72–73.  *Seminole Tribe* makes clear that Congress may not abrogate state sovereign immunity pursuant to its Article I powers; hence the Patent Remedy Act cannot be sustained under either the Commerce Clause or the Patent Clause.  *Ibid.*  The Federal Circuit recognized this, and College Savings and the United States do not contend otherwise.

Instead, College Savings and the United States argue that the Federal Circuit properly concluded that Congress enacted the Patent Remedy Act to secure the Fourteenth Amendment's protections against deprivations of property without due process of law.  The Fourteenth Amendment provides in relevant part:

> "Section 1. . . . No State shall . . . deprive any person of life, liberty, or property, without due process of law.
>
> .        .        .        .        .
>
> "Section 5.  The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

While reaffirming the view that state sovereign immunity does not yield to Congress' Article I powers, this Court in

---

[4] The Patent Clause provides that "Congress shall have Power . . . [t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  Art. I, § 8, cl. 8.  The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the Several States, and with the Indian Tribes."  Art. I, § 8, cl. 3.  The relevant portions of the Fourteenth Amendment are discussed below.

*Seminole Tribe* also reaffirmed its holding in *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976), that Congress retains the authority to abrogate state sovereign immunity pursuant to the Fourteenth Amendment. Our opinion explained that in *Fitzpatrick*, "we recognized that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal power struck by the Constitution." *Seminole Tribe, supra,* at 59. The Court further described *Fitzpatrick* as holding that "through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that §5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that Amendment." *Seminole Tribe, supra,* at 59.

College Savings and the United States are correct in suggesting that "appropriate" legislation pursuant to the Enforcement Clause of the Fourteenth Amendment could abrogate state sovereignty. Congress itself apparently thought the Patent Remedy Act could be so justified:

> "[T]he bill is justified as an acceptable method of enforcing the provisions of the fourteenth amendment. The Court in *Lemelson* v. *Ampex Corp.*[, 372 F. Supp. 708 (ND Ill. 1974),] recognized that a patent is a form of property, holding that a right to compensation exists for patent infringement. Additionally, because courts have continually recognized patent rights as property, the fourteenth amendment prohibits a State from depriving a person of property without due process of law." S. Rep., at 8 (footnotes omitted).

We have held that "[t]he 'provisions of this article,' to which §5 refers, include the Due Process Clause of the Fourteenth Amendment." *City of Boerne* v. *Flores*, 521 U. S., at 519.

But the legislation must nonetheless be "appropriate" under §5 as that term was construed in *City of Boerne.*

There, this Court held that the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U. S. C. §2000bb *et seq.*, exceeded Congress' authority under §5 of the Fourteenth Amendment, insofar as RFRA was made applicable to the States. RFRA was enacted "in direct response to" this Court's decision in *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872 (1990), which construed the Free Exercise Clause of the First Amendment to hold that "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." *City of Boerne, supra,* at 512, 514. Through RFRA, Congress reinstated the compelling governmental interest test eschewed by *Smith* by requiring that a generally applicable law placing a "substantial burden" on the free exercise of religion must be justified by a "compelling governmental interest" and must employ the "least restrictive means" of furthering that interest. 521 U. S., at 515–516.

In holding that RFRA could not be justified as "appropriate" enforcement legislation under §5, the Court emphasized that Congress' enforcement power is "remedial" in nature. *Id.,* at 519. We recognized that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" *Id.,* at 518 (citation omitted). We also noted, however, that "'[a]s broad as the congressional enforcement power is, it is not unlimited,'" *ibid.,* and held that "Congress does not enforce a constitutional right by changing what the right is. It has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation," *id.,* at 519. Canvassing the history of the Fourteenth Amendment and

case law examining the propriety of Congress' various voting rights measures,[5] the Court explained:

> "While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect." *Id.*, at 519–520.

We thus held that for Congress to invoke § 5, it must identify conduct transgressing the Fourteenth Amendment's substantive provisions, and must tailor its legislative scheme to remedying or preventing such conduct.

RFRA failed to meet this test because there was little support in the record for the concerns that supposedly animated the law. *Id.*, at 530–531. And, unlike the measures in the voting rights cases, RFRA's provisions were "so out of proportion to a supposed remedial or preventive object" that RFRA could not be understood "as responsive to, or designed to prevent, unconstitutional behavior." *Id.*, at 532; see also *id.*, at 534 ("Simply put, RFRA is not designed to identify and counteract state laws likely to be unconstitutional").

Can the Patent Remedy Act be viewed as remedial or preventive legislation aimed at securing the protections of the Fourteenth Amendment for patent owners? Following *City of Boerne*, we must first identify the Fourteenth Amendment "evil" or "wrong" that Congress intended to remedy, guided

---

[5] See *South Carolina* v. *Katzenbach*, 383 U. S. 301 (1966); *Katzenbach* v. *Morgan*, 384 U. S. 641 (1966); *Oregon* v. *Mitchell*, 400 U. S. 112 (1970); *City of Rome* v. *United States*, 446 U. S. 156 (1980).

by the principle that the propriety of any §5 legislation "'must be judged with reference to the historical experience . . . it reflects.'" *Id.*, at 525. The underlying conduct at issue here is state infringement of patents and the use of sovereign immunity to deny patent owners compensation for the invasion of their patent rights. See H. R. Rep., at 37–38 ("[P]atent owners are effectively denied a remedy for damages resulting from infringement by a State or State entity"); S. Rep., at 6 ("[P]laintiffs in patent infringement cases against a State are foreclosed from damages, regardless of the State conduct"). It is this conduct then—unremedied patent infringement by the States—that must give rise to the Fourteenth Amendment violation that Congress sought to redress in the Patent Remedy Act.

In enacting the Patent Remedy Act, however, Congress identified no pattern of patent infringement by the States, let alone a pattern of constitutional violations. Unlike the undisputed record of racial discrimination confronting Congress in the voting rights cases, see *City of Boerne, supra,* at 525–527, Congress came up with little evidence of infringing conduct on the part of the States. The House Report acknowledged that "many states comply with patent law" and could provide only two examples of patent infringement suits against the States. See H. R. Rep., at 38. The Federal Circuit in its opinion identified only eight patent-infringement suits prosecuted against the States in the 110 years between 1880 and 1990. See 148 F. 3d, at 1353–1354.

Testimony before the House Subcommittee in favor of the bill acknowledged that "states are willing and able to respect patent rights. The fact that there are so few reported cases involving patent infringement claims against states underlies the point." Patent Remedy Clarification Act: Hearing on H. R. 3886 before the Subcommittee on Courts, Intellectual Property, and the Administration of Justice of the House Committee on the Judiciary, 101st Cong., 2d Sess., 56 (1990) (hereinafter House Hearings) (statement of William

S. Thompson); *id.*, at 32 (statement of Robert Merges) ("[S]tates do occasionally find themselves in patent infringement suits"). Even the bill's sponsor conceded that "[w]e do not have any evidence of massive or widespread violation of patent laws by the States either with or without this State immunity." *Id.*, at 22 (statement of Rep. Kastenmeier).[6] The Senate Report, as well, contains no evidence that unremedied patent infringement by States had become a problem of national import. At most, Congress heard testimony that patent infringement by States might increase in the future, see House Hearings 22 (statement of Jeffrey Samuels); *id.*, at 36–37 (statement of Robert Merges); *id.*, at 57 (statement of William Thompson), and acted to head off this speculative harm. See H. R. Rep., at 38.

College Savings argues that by infringing a patent and then pleading immunity to an infringement suit, a State not only infringes the patent, but deprives the patentee of property without due process of law and "takes" the property in the patent without paying the just compensation required

---

[6] Representative Kastenmeier made this statement in the course of questioning Jeffrey M. Samuels, Acting Commissioner of Patents and Trademarks, U. S. Department of Commerce. The discussion continued:

"Mr. KASTENMEIER. . . .

"Accordingly, could one argue that this legislation may be premature. We really do not know whether it will have any affect *[sic]* or not.

"Mr. SAMUELS. Well, you are right, Mr. Chairman. There have not been many cases that have raised this issue. I guess our feeling is that it is a step that should be taken now because the possibility exists in light of *Atascadero* and in light of the *Chew* case that more States will get involved in infringing patents.

"I guess as a general policy statement, we believe that those engaged— those who do engage in patent infringement should be subject to all the remedies that are set forth in the Patent Act and that the rights of a patent owner should not be dependent upon the identity of the entity who is infringing, whether it be a private individual, or corporation, or State.

"So just as a general philosophical matter, we believe that this law needs to be passed."

by the Fifth Amendment.[7] The United States declines to defend the Act as based on the Just Compensation Clause, but joins in College Savings' defense of the Act as designed to prevent a State from depriving a patentee of property without due process of law. Florida Prepaid contends that Congress may not invoke § 5 to protect property interests that it has created in the first place under Article I. Patents, however, have long been considered a species of property. See *Brown* v. *Duchesne,* 19 How. 183, 197 (1857) ("For, by the laws of the United States, the rights of a party under a patent are his private property"); cf., *Consolidated Fruit-Jar Co.* v. *Wright,* 94 U. S. 92, 96 (1877) ("A patent for an invention is as much property as a patent for land"). As such, they are surely included within the "property" of which no person may be deprived by a State without due process of law. And if the Due Process Clause protects patents, we know of no reason why Congress might not legislate against their deprivation without due process under § 5 of the Fourteenth Amendment.

Though patents may be considered "property" for purposes of our analysis, the legislative record still provides little support for the proposition that Congress sought to remedy a Fourteenth Amendment violation in enacting the Patent Remedy Act. The Due Process Clause provides, "nor shall any State deprive any person of life, liberty, or property, *without due process of law."* U. S. Const., Amdt. 14, § 1 (emphasis added). This Court has accordingly held that "[i]n procedural due process claims, the deprivation by

---

[7] There is no suggestion in the language of the statute itself, or in the House or Senate Reports of the bill which became the statute, that Congress had in mind the Just Compensation Clause of the Fifth Amendment. Since Congress was so explicit about invoking its authority under Article I and its authority to prevent a State from depriving a person of property without due process of law under the Fourteenth Amendment, we think this omission precludes consideration of the Just Compensation Clause as a basis for the Patent Remedy Act.

state action of a constitutionally protected interest . . . is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Zinermon* v. *Burch*, 494 U. S. 113, 125 (1990) (emphasis deleted).

Thus, under the plain terms of the Clause and the clear import of our precedent, a State's infringement of a patent, though interfering with a patent owner's right to exclude others, does not by itself violate the Constitution. Instead, only where the State provides no remedy, or only inadequate remedies, to injured patent owners for its infringement of their patent could a deprivation of property without due process result. See *Parratt* v. *Taylor*, 451 U. S. 527, 539–541 (1981); *Hudson* v. *Palmer*, 468 U. S. 517, 532–533 (1984); *id.*, at 539 (O'CONNOR, J., concurring) ("[I]n challenging a property deprivation, the claimant must either avail himself of the remedies guaranteed by state law or prove that the available remedies are inadequate . . . . When adequate remedies are provided and followed, no . . . deprivation of property without due process can result").

Congress, however, barely considered the availability of state remedies for patent infringement and hence whether the States' conduct might have amounted to a constitutional violation under the Fourteenth Amendment. It did hear a limited amount of testimony to the effect that the remedies available in some States were uncertain.[8]

---

[8] See, *e. g.*, House Hearings 33 (statement of Robert Merges) ("Thus a patentee . . . would apparently have to draft her cause of action as a general tort claim—or perhaps one for restitution—to come within the statute. This might be impossible, or at least difficult under California law"); *id.*, at 43 ("[I]t is true that you may have State remedies, alternative State remedies. . . . You could bring a deceit suit. You could try just a general unfair competition suit. A restitution is one that has occurred to me as a possible basis of recovery"); *id.*, at 34 ("Another problem with this approach is that it assumes that such state law remedies will be available in every state in which the patentee's product is sold. This may or may not be true"); *id.*, at 47 (statement of William Thompson) ("In this case

The primary point made by these witnesses, however, was not that state remedies were constitutionally inadequate, but rather that they were less convenient than federal remedies, and might undermine the uniformity of patent law. See, e. g., House Hearings 43 (statement of Robert Merges) ("[U]niformity again dictates that that sovereign immunity is a mistake in this field because of the variance among the State's laws"), id., at 34, 41 (Merges); id., at 58 (statement of William Thompson).[9]

Congress itself said nothing about the existence or adequacy of state remedies in the statute or in the Senate Report, and made only a few fleeting references to state remedies in the House Report, essentially repeating the testimony of the witnesses. See H. R. Rep., at 37, n. 158 ("[T]he availability of a State remedy is tenuous and could vary significantly State to State"); id., at 38 ("[I]f patentees turn to the State courts for alternative forms of relief from patent infringement, the result will be a patchwork of State laws, actually undermining the goal of national uniformity in

there is no balance, since there are no—or at least there are not very effective patent remedies at the State level"); id., at 57 ("The court in Lane [v. First Nat. Bank of Boston, 687 F. Supp. 11 (Mass. 1988),] pointed out that the appellant may be able to obtain money damages by recourse to the Massachusetts tort claims act or sue the state for deceit, conversion, or unfair competition under Massachusetts law. The court also noted a Massachusetts statute which provides that damages may be recovered from the state when private property is confiscated for a public purpose. While many states may have similar statutes, the courts' surmise that intellectual property infringement cases may be pursued in some state courts offer us little comfort"); id., at 60 ("[I]t sounds to me like it is a very difficult area to predict what would happen. There is a rich variety of potential causes of action, as the prior speaker [Merges] pointed out").

[9] It is worth mentioning that the State of Florida provides remedies to patent owners for alleged infringement on the part of the State. Aggrieved parties may pursue a legislative remedy through a claims bill for payment in full, Fla. Stat. § 11.065 (1997), or a judicial remedy through a takings or conversion claim, see Jacobs Wind Electric Co. v. Florida Dept. of Transp., 626 So. 2d 1333 (Fla. 1993).

our patent system"). The need for uniformity in the construction of patent law is undoubtedly important, but that is a factor which belongs to the Article I patent-power calculus, rather than to any determination of whether a state plea of sovereign immunity deprives a patentee of property without due process of law.

We have also said that a state actor's negligent act that causes unintended injury to a person's property does not "deprive" that person of property within the meaning of the Due Process Clause. See *Daniels* v. *Williams,* 474 U. S. 327, 328 (1986). Actions predicated on direct patent infringement, however, do not require any showing of intent to infringe; instead, knowledge and intent are considered only with respect to damages. See 35 U. S. C. §271(a) (1994 ed., Supp. III); 5 D. Chisum, Patents §16.02[2], p. 16–31 (rev. ed. 1998) (" 'It is, of course, elementary, that an infringement may be entirely inadvertent and unintentional and without knowledge of the patent' "). Congress did not focus on instances of intentional or reckless infringement on the part of the States. Indeed, the evidence before Congress suggested that most state infringement was innocent or at worst negligent. See S. Rep., at 10 (" 'It is not always clear that with all the products that [government] buy[s], that anyone is really aware of the patent status of any particular invention or device or product' "); H. R. Rep., at 39 ("[I]t should be very rare for a court to find . . . willful infringement on the part of a State or State agency"). Such negligent conduct, however, does not violate the Due Process Clause of the Fourteenth Amendment.

The legislative record thus suggests that the Patent Remedy Act does not respond to a history of "widespread and persisting deprivation of constitutional rights" of the sort Congress has faced in enacting proper prophylactic §5 legislation. *City of Boerne,* 521 U. S., at 526. Instead, Congress appears to have enacted this legislation in response to a handful of instances of state patent infringement that do not

necessarily violate the Constitution. Though the lack of support in the legislative record is not determinative, see *id.*, at 531, identifying the targeted constitutional wrong or evil is still a critical part of our § 5 calculus because "[s]trong measures appropriate to address one harm may be an unwarranted response to another, lesser one," *id.*, at 530. Here, the record at best offers scant support for Congress' conclusion that States were depriving patent owners of property without due process of law by pleading sovereign immunity in federal-court patent actions.

Because of this lack, the provisions of the Patent Remedy Act are "so out of proportion to a supposed remedial or preventive object that [they] cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.*, at 532. An unlimited range of state conduct would expose a State to claims of direct, induced, or contributory patent infringement, and the House Report itself cited testimony acknowledging "'it[']s difficult for us to identify a patented product or process which might not be used by a state.'" H. R. Rep., at 38.[10] Despite subjecting States to this expansive liability, Congress did nothing to limit the coverage of the Act to cases involving arguable constitutional violations, such as where a State refuses to offer any

---

[10] The relevant testimony stated in full:

"The comments regarding copyright centered on substantial use of copyrighted textbooks by state universities as well as state use of copyrighted music and computer software. State use of patented products is more diverse and more substantial. Patented inventions are involved in all manner of commonly used machines, tools, instruments, chemicals, compounds, materials, and devices of all description and purpose. Furthermore, patented processes are commonplace. States and state instrumentalities own and operate hospitals, universities, prisons, and libraries. States build and maintain roads. States provide facilities and equipment for large numbers of employees who perform all manner of state supported activities. It[']s difficult for us to identify a patented product or process which might not be used by a state." House Hearings 55 (statement of William Thompson).

state-court remedy for patent owners whose patents it had infringed. Nor did it make any attempt to confine the reach of the Act by limiting the remedy to certain types of infringement, such as nonnegligent infringement or infringement authorized pursuant to state policy; or providing for suits only against States with questionable remedies or a high incidence of infringement.

Instead, Congress made all States immediately amenable to suit in federal court for all kinds of possible patent infringement and for an indefinite duration. Our opinion in *City of Boerne* discussed with approval the various limits that Congress imposed in its voting rights measures, see 521 U. S., at 532–533, and noted that where "a congressional enactment pervasively prohibits constitutional state action in an effort to remedy or to prevent unconstitutional state action, limitations of this kind tend to ensure Congress' means are proportionate to ends legitimate under § 5," *id.*, at 533. The Patent Remedy Act's indiscriminate scope offends this principle, and is particularly incongruous in light of the scant support for the predicate unconstitutional conduct that Congress intended to remedy. In sum, it simply cannot be said that "many of [the acts of infringement] affected by the congressional enactment have a significant likelihood of being unconstitutional." *Id.*, at 532.

The historical record and the scope of coverage therefore make it clear that the Patent Remedy Act cannot be sustained under § 5 of the Fourteenth Amendment. The examples of States avoiding liability for patent infringement by pleading sovereign immunity in a federal-court patent action are scarce enough, but any plausible argument that such action on the part of the State deprived patentees of property and left them without a remedy under state law is scarcer still. The statute's apparent and more basic aims were to provide a uniform remedy for patent infringement and to place States on the same footing as private parties under

that regime.[11]    These are proper Article I concerns, but that Article does not give Congress the power to enact such legislation after *Seminole Tribe.*

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

The Constitution vests Congress with plenary authority over patents and copyrights. U. S. Const., Art. I, §8, cl. 8.    Nearly 200 years ago, Congress provided for exclusive jurisdiction of patent infringement litigation in the federal courts.[1]    See *Campbell* v. *Haverhill,* 155 U. S. 610, 620

---

[11] See 35 U. S. C. §271(h) (stating that States and state entities "shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity"); see also H. R. Rep., at 40 ("The Committee believes that the full panoply of remedies provided in the patent law should be available to patentees whose legitimate rights have been infringed by States or State entities"); S. Rep., at 14.    Thus, contrary to the dissent's intimation, see *post,* at 663 (opinion of STEVENS, J.), the Patent Remedy Act does not put States in the same position as the United States.    Under the Patent Remedy Act, States are subject to all the remedies available to plaintiffs in infringement actions, which include punitive damages and attorney's fees, see 35 U. S. C. §§284, 285, as well as injunctive relief, see §283.    In waiving its own immunity from patent infringement actions in 28 U. S. C. §1498(a) (1994 ed. and Supp. III), however, the United States did not consent to either treble damages or injunctive relief, and allowed reasonable attorney's fees only in a narrow class of specified instances.

[1] See Act of Apr. 17, 1800, ch. 25, 2 Stat. 37; Act of Feb. 19, 1819, ch. 19, 3 Stat. 481.    There is some dispute about whether federal jurisdiction over patent cases became exclusive in 1800 or in 1836.    See 7 D. Chisum, Patents §20.02[1][a], n. 9 (1998).    In any event, 28 U. S. C. §1338(a) now provides: "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trade-marks.    Such ju-

(1895). In 1992 Congress clarified that jurisdictional grant by an amendment to the patent law that unambiguously authorizes patent infringement actions against States, state instrumentalities, and any officer or employee of a State acting in his official capacity. Pub. L. 102–560, 106 Stat. 4230, 35 U. S. C. §271(h). Given the absence of effective state remedies for patent infringement by States and the statutory pre-emption of such state remedies, the 1992 Patent and Plant Variety Protection Remedy Clarification Act (Patent Remedy Act) was an appropriate exercise of Congress' power under §5 of the Fourteenth Amendment to prevent state deprivations of property without due process of law.

This Court's recent decision in *City of Boerne* v. *Flores,* 521 U. S. 507 (1997), amply supports congressional authority to enact the Patent Remedy Act, whether one assumes that States seldom infringe patents, see *ante,* at 640–641, 645–646, or that patent infringements potentially permeate an "unlimited range of state conduct," see *ante,* at 646. Before discussing *City of Boerne,* however, I shall comment briefly on the principle that undergirds all aspects of our patent system: national uniformity.

## I

In his commentaries on the Federal Constitution, Justice Story said of the Patent and Copyright Clauses:

"It is beneficial to all parties, that the national government should possess this power; to authors and inven-

risdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases." The second sentence of § 1338(a) (excluding the reference to plant variety protection cases) has been worded in essentially the same way since 1878. See Rev. Stat. § 711 (1878). This Court has used various criteria for determining when an action "arises under" the patent law, see, *e. g., Dale Tile Mfg. Co.* v. *Hyatt,* 125 U. S. 46, 52–53 (1888), but it is well established that a patent infringement claim is "the paradigm of an action 'arising under' the patent laws." 8 Chisum, Patents § 21.02[1][b].

tors, because, otherwise, they would be subjected to the varying laws and systems of the different states on this subject, which would impair, and might even destroy the value of their rights; to the public, as it will promote the progress of science and the useful arts, and admit the people at large, after a short interval, to the full possession and enjoyment of all writings and inventions without restraint." J. Story, Commentaries on the Constitution of the United States § 502, p. 402 (R. Rotunda & J. Nowak eds. 1987).

James Madison said of the same Clause, "The utility of this power will scarcely be questioned . . . . The States cannot separately make effectual provision for either [copyrights or patents], and most of them have anticipated the decision of this point, by laws passed at the instance of Congress." The Federalist No. 43, p. 267 (H. Lodge ed. 1908) (J. Madison).

Sound reasons support both Congress' authority over patents and its subsequent decision in 1800 to vest exclusive jurisdiction over patent infringement litigation in the federal courts. The substantive rules of law that are applied in patent infringement cases are entirely federal. From the beginning, Congress has given the patentee the right to bring an action for patent infringement. § 4, 1 Stat. 111. There is, accordingly, a strong federal interest in an interpretation of the patent statutes that is both uniform and faithful to the constitutional goals of stimulating invention and rewarding the disclosure of novel and useful advances in technology. See *Graham* v. *John Deere Co. of Kansas City*, 383 U. S. 1, 9 (1966). Federal interests are threatened, not only by inadequate protection for patentees, but also when overprotection may have an adverse impact on a competitive economy. See *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U. S. 141, 162–163 (1989). Therefore, consistency, uniformity, and familiarity with the extensive and relevant body of patent jurisprudence are matters of overriding significance in this area of the law.

Patent infringement litigation often raises difficult technical issues that are unfamiliar to the average trial judge.[2] That consideration, as well as the divergence among the federal circuits in their interpretation of patent issues, provided support for the congressional decision in 1982 to consolidate appellate jurisdiction of patent appeals in the Court of Appeals for the Federal Circuit.[3] Although that court has jurisdiction over all appeals from federal trial courts in patent infringement cases, it has no power to review state-court decisions on questions of patent law. See 28 U. S. C. § 1295.

---

[2] The Advisory Commission on Patent Law Reform recommended in 1992 that patent jurisdiction be restricted to a single district court per circuit and that district courts designate and use judges with special expertise in patent litigation. "With this increased expertise, courts would be able to more effectively control litigation proceedings, and ensure consistency in the application of substantive patent law . . . . Of course, the restricted jurisdictional provision would reduce the flexibility currently available to parties to file actions pursuant to the general jurisdictional authority. Yet patent practice is an essentially national practice in the United States. The 'costs' in terms of lost flexibility associated with this change would appear to be relatively minor in comparison to the prospective benefits in uniformity of practice." Advisory Commission on Patent Law Reform, D. Comer et al., Report to the Secretary of Commerce 99 (Aug. 1992).

[3] In its Report on the Federal Courts Improvement Act of 1982, the House stated, "Patent litigation long has been identified as a problem area, characterized by undue forum-shopping and unsettling inconsistency in adjudications. Based on the evidence it compiled during the course of thorough hearings on the subject, the Commission on Revision of the Federal Court Appellate System—created by Act of Congress—concluded that patent law is an area in which the application of the law to the facts of a case often produces different outcomes in different courtrooms in substantially similar cases. As a result, some circuit courts are regarded as 'pro-patent' and other 'anti-patent,' and much time and money is expended in 'shopping' for a favorable venue. In a Commission survey of practitioners, the patent bar reported that uncertainty created by the lack of national law precedent was a significant problem; the Commission found patent law to be an area in which widespread forum-shopping was particularly acute." H. R. Rep. No. 97–312, pp. 20–21 (1981) (footnotes omitted); see also S. Rep. No. 97–275, p. 5 (1981).

The reasons that motivated the creation of the Federal Circuit would be undermined by any exception that allowed patent infringement claims to be brought in state court.

Today the Court first acknowledges that the "need for uniformity in the construction of patent law is undoubtedly important," *ante*, at 645, but then discounts its significance as merely "a factor which belongs to the Article I patent-power calculus, rather than to any determination of whether a state plea of sovereign immunity deprives a patentee of property without due process of law." *Ibid.* But the "Article I patent-power calculus" is directly relevant to this case because it establishes the constitutionality of the congressional decision to vest exclusive jurisdiction over patent infringement cases in the federal courts. That basic decision was unquestionably appropriate. It was equally appropriate for Congress to abrogate state sovereign immunity in patent infringement cases in order to close a potential loophole in the uniform federal scheme, which, if undermined, would necessarily decrease the efficacy of the process afforded to patent holders.

## II

Our recent decision in *City of Boerne* v. *Flores*, 521 U. S. 507 (1997), sets out the general test for determining whether Congress has enacted "appropriate" legislation pursuant to § 5 of the Fourteenth Amendment. "There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.*, at 520. The first step of the inquiry, then, is to determine what injury Congress sought to prevent or remedy with the relevant legislation.

As the Court recognizes, Congress' authority under § 5 of the Fourteenth Amendment extends to enforcing the Due Process Clause of that Amendment. *Ante*, at 637. Congress decided, and I agree, that the Patent Remedy Act was a proper exercise of this power.

The Court acknowledges, as it must, that patents are property. *Ante,* at 642; see also *Consolidated Fruit-Jar Co.* v. *Wright,* 94 U. S. 92, 96 (1877). Every valid patent "gives the patentee or his assignee the 'exclusive right to make, use, and vend the invention or discovery' for a limited period." *Transparent-Wrap Machine Corp.* v. *Stokes & Smith Co.,* 329 U. S. 637, 643 (1947). The Court suggests, however, that a State's infringement of a patent does not necessarily constitute a "deprivation" within the meaning of the Due Process Clause, because the infringement may be done negligently. *Ante,* at 645.

As part of its attempt to stem the tide of prisoner litigation, and to avoid making "the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States," *Daniels* v. *Williams,* 474 U. S. 327, 332–334 (1986), this Court has drawn a constitutional distinction between negligent and intentional misconduct. Injuries caused by the mere negligence of state prison officials—in leaving a pillow on the stairs of the jail, for example—do not "deprive" anyone of liberty or property within the meaning of the Due Process Clause of that Amendment. *Ibid.* On the other hand, willful misconduct, and perhaps "recklessness or gross negligence," may give rise to such a deprivation. *Id.,* at 334.

While I disagree with the Court's assumption that this standard necessarily applies to deprivations of patent rights, the *Daniels* line of cases has only marginal relevance to this case: Respondent College Savings Bank has alleged that petitioner's infringement was willful.[4] The question presented by this case, then, is whether the Patent Remedy Act,

---

[4] Paragraph 7 of College Savings' complaint alleges that "'[d]efendant Florida Prepaid with actual knowledge of the '055 patent, with knowledge of its infringement, and without lawful justification, has willfully infringed the '055 patent.'" App. to Pet. for Cert. 30a.

which clarified Congress' intent to subject state infringers to suit in federal court, may be applied to willful infringement.[5]

As I read the Court's opinion, its negative answer to that question has nothing to do with the facts of this case. Instead, it relies entirely on perceived deficiencies in the evidence reviewed by Congress before it enacted the clarifying amendment. "In enacting the Patent Remedy Act . . . Congress identified no pattern of patent infringement by the States, let alone a pattern of constitutional violations." *Ante,* at 640.

It is quite unfair for the Court to strike down Congress' Act based on an absence of findings supporting a requirement this Court had not yet articulated. The legislative history of the Patent Remedy Act makes it abundantly clear that Congress was attempting to hurdle the then-most-recent barrier this Court had erected in the Eleventh Amendment course—the "clear statement" rule of *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234 (1985).[6]

---

[5] As a practical matter, infringement actions based on mere negligence rarely arise. Most patent infringers are put on notice that their conduct may be actionable before an infringement suit is filed. "The first step in enforcing a patent is usually to send a cease-and-desist or charge-of-infringement letter." Pokotilow & Siegal, Cease and Desist Letters: The Legal Pitfalls for Patentees, 4 Intellectual Property Strategist, No. 3, p. 1 (1997).

[6] The Chairman of the House Subcommittee considering the Patent Remedy Act, Representative Kastenmeier, engaged in the following dialogue with William Thompson, President of the American Intellectual Property Law Association, about whether States were definitively immune from suit under the Eleventh Amendment following the Federal Circuit's recent decision in *Chew* v. *California,* 893 F. 2d 331 (1990):

"Mr. KASTENMEIER. You mentioned that you do not see the likelihood of further cases in this area since the *Atascadero* and *Chew* cases seem to be fairly definitive on this question, unless there were in fact remedial legislation. Do you anticipate that remedial legislation, such as the bill before us, if passed into law, would be the subject of litigation?

"Mr. THOMPSON. No, I think it would be very clear. Your legislation is very clearly drawn. It seems to match the tests set forth in *Atascadero*

Nevertheless, Congress did hear testimony about inadequate state remedies for patent infringement when considering the Patent Remedy Act. The leading case referred to in the congressional hearing was *Chew* v. *California*, 893 F. 2d 331 (CA Fed. 1990). In fact, *Chew* prompted Congress to consider the legislation that became the Patent Remedy Act. See H. R. Rep. No. 101–960, pt. 1, p. 7, and n. 20 (1990). The Federal Circuit held in that case that congressional intent to abrogate state sovereign immunity under the patent laws was not "unmistakably clear," as this Court had required in *Atascadero*. *Chew*, 893 F. 2d, at 334.

The facts of *Chew* clearly support both Congress' decision and authority to enact the Patent Remedy Act. Marian Chew had invented a method for testing automobile engine exhaust emissions and secured a patent on her discovery. Her invention was primarily used by States and other governmental entities. In 1987, Chew, an Ohio resident, sued the State of California in federal court for infringing her patent. California filed a motion to dismiss on Eleventh Amendment grounds, which the District Court granted. The Federal Circuit affirmed, *id.*, at 332, expressly stating that the question whether Chew had a remedy under California law "is a question not before us." Nevertheless, it implied that its decision would have been the same even if Chew were left without any remedy. *Id.*, at 336. During its hearing on the Patent Remedy Act, Congress heard testimony about the *Chew* case. Professor Merges stated that Chew might not have been able to draft her infringement suit as a tort claim. "This might be impossible, o[r] at least

---

of making it very clear that the patent statute is one that would qualify as an abrogation area *[sic]* in the 11th amendment.

"I can never guarantee exactly how attorneys are going to read statutes, Mr. Chairman, but all of the sane ones would not bring an action." Hearing before the Subcommittee on Courts, Intellectual Property, and the Administration of Justice of the House Committee on the Judiciary, 101st Cong., 2d Sess., 60 (1990) (House Hearing).

difficult, under California law. Consequently, relief under [state statutes] may be not be a true alternative avenue of recovery." House Hearing 33.[7]

Congress heard other general testimony that state remedies would likely be insufficient to compensate inventors whose patents had been infringed. The Acting Commissioner of Patents stated: "If States and their instrumentalities were immune from suit in federal court for patent infringement, patent holders would be forced to pursue uncertain, perhaps even non-existent, remedies under State law." *Id.*, at 15. The legislative record references several cases of patent infringement involving States. See *Paperless Accounting, Inc.* v. *Mass Transit Administration,* Civil No. HAR 84-2922 (D. Md. 1985) (cited in House Hearing 56); *Hercules, Inc.* v. *Minnesota State Highway Dept.,* 337 F. Supp. 795 (Minn. 1972) (House Hearing 51); *Lemelson* v. *Ampex Corp.,* 372 F. Supp. 708 (ND Ill. 1974) (same).

In addition, Congress found that state infringement of patents was likely to increase. H. R. Rep. No. 101-960, pt. 1, at 38. The Court's opinion today dismisses this rationale: "At most, Congress heard testimony that patent infringement by States might increase in the future and acted to head off this speculative harm." *Ante,* at 641 (citations omitted). In fact, States and their instrumentalities, especially state universities, have been involved in many patent cases since 1992. See *Regents of Univ. of Minn.* v. *Glaxo Wellcome, Inc.,* 44 F. Supp. 2d 998 (Minn. 1999) (declaratory

---

[7] Merges continued: "Another problem with this approach is that it assumes that such state law remedies will be available in every state in which the patentee's product is sold. This may or may not be true. In any event, requiring a potential plaintiff (patentee) to ascertain the validity of her claims under the differing substantive and procedural laws of the fifty states may well prove a very substantial disincentive to the commencement of such suits. Moreover, it would vitiate a major goal of the federal intellectual property system: national uniformity. In short, these remedies are simply no substitute for patent infringement actions." *Id.,* at 34.

judgment action filed by the University of Minnesota); *University of Colo. Foundation, Inc.* v. *American Cyanamid Co.*, 974 F. Supp. 1339 (Colo. 1997) (patent infringement action filed by University of Colorado); *Gen-Probe, Inc.* v. *Amoco Corp., Inc.*, 926 F. Supp. 948 (SD Cal. 1996) (suit filed against various parties, alleging, *inter alia,* that Regents of the University of California induced patent infringement by Amoco); *Genentech* v. *Regents of Univ. of Cal.*, 143 F. 3d 1446 (CA Fed. 1998) (declaratory judgment suit filed by Genentech); *Ciba-Geigy* v. *Alza Corp.*, 804 F. Supp. 614 (NJ 1992) (counterclaim brought by Alza against Regents of the University of California).

Furthermore, States and their instrumentalities are heavily involved in the federal patent system.[8] The United States Patent and Trademark Office issued more than 2,000 patents to universities (both public and private) in 1986 alone. Chakansky, Patent Profiles, 13 Computer Law Strategist, No. 9, p. 8 (1997). Royalty earnings from licenses at United States universities totaled $273.5 million in 1995, a 12% increase over the prior year. 2 Eckstrom's Licensing in Foreign and Domestic Operations § 11.06 (D. Epstein ed. 1998). The State of Florida has obtained over 200 United States patents since the beginning of 1995. Brief for New York Intellectual Property Law Association as *Amicus Curiae* 2. All 50 States own or have obtained patents. Brief for United States 44.

It is true that, when considering the Patent Remedy Act, Congress did not review the remedies available in each State for patent infringements and surmise what kind of recovery

---

[8] See generally Dueker, Biobusiness on Campus: Commercialization of University-Developed Biomedical Technologies, 52 Food & Drug L. J. 453 (1997); Bertha, Intellectual Property Activities in U. S. Research Universities, 36 IDEA: J. L. & Tech. 513 (1996); Eisenberg, Public Research and Private Development: Patents and Technology Transfer in Government-Sponsored Research, 82 Va. L. Rev. 1663 (1996).

a plaintiff might obtain in a tort suit in all 50 jurisdictions.[9] See *ante*, at 643.   But, it is particularly ironic that the Court should view this fact as support for its holding.  Given that Congress had long ago pre-empted state jurisdiction over patent infringement cases, it was surely reasonable for Congress to assume that such remedies simply did not exist.[10] Furthermore, it is well known that not all States have

---

[9] To the extent that a majority of this Court finds this factor dispositive, there is hope that the Copyright Remedy Clarification Act of 1990 may be considered "appropriate" § 5 legislation.   The legislative history of that Act includes many examples of copyright infringements by States—especially state universities.   See Hearings on H. R. 1131 before the Subcommittee on Courts, Intellectual Property, and the Administration of Justice of the House Committee on the Judiciary, 101st Cong., 1st Sess., 93, 148 (1989); Hearing on S. 497 before the Subcommittee on Patents, Copyrights, and Trademarks of the Senate Committee on the Judiciary, 101st Cong., 1st Sess., 148 (1989).   Perhaps most importantly, the House requested that the Register of Copyrights prepare a study, which he described in his transmittal letter as, "a factual inquiry about enforcement of copyright against state governments and about unfair copyright licensing practices, if any, with respect to state government use of copyrighted works.   I have also prepared an in-depth analysis of the current state of Eleventh Amendment law and the decisions relating to copyright liability of states, including an assessment of any constitutional limitations on Congressional action.   Finally, as you requested, the American Law Division of the Congressional Research Service has conducted a 50 state survey of the statutes and case law concerning waiver of state sovereign immunity."   Register of Copyrights, R. Oman, Copyright Liability of States and the Eleventh Amendment (June 1988) (transmittal letter).   This report contains comments from industry groups, statistics, and legal analysis relating to copyright violations, actual and potential, by States.   See *id.*, at 5, 12, 14, 93–95.

[10] After the 1992 Act was passed, the Florida Supreme Court did hold that a patentee might bring some sort of "takings" claim in a state court, or might seek a legislative remedy.   See *Jacobs Wind Electric Co.* v. *Florida Dept. of Transp.*, 626 So. 2d 1333 (1993).   Given the unambiguous text of 28 U. S. C. § 1338, there is (a) no reason why Congress could have anticipated that decision, and (b) good reason to believe a well-motivated court may have misinterpreted federal law.   See *Jacobs Wind*, 626 So. 2d, at 1337–1338 (Harding, J., dissenting).

waived their sovereign immunity from suit,[11] and among those States that have, the contours of this waiver vary widely.[12]

Even if such remedies might be available in theory, it would have been "appropriate" for Congress to conclude that they would not guarantee patentees due process in infringement actions against state defendants. State judges have never had the exposure to patent litigation that federal judges have experienced for decades, and, unlike infringement actions brought in federal district courts, their decisions would not be reviewable in the Court of Appeals for the Federal Circuit. Surely this Court would not undertake the task of reviewing every state-court decision that arguably misapplied patent law.[13] And even if 28 U. S. C. § 1338 is amended or construed to permit state courts to entertain infringement actions when a State is named as a defendant, given the Court's opinion in *Alden* v. *Maine*, it is by no means clear that state courts could be required to hear these cases at all. *Post,* at 712.

---

[11] See, *e. g.,* Ala. Code § 41–9–60 (1991) (claims may only be brought administratively); W. Va. Const., Art. VI, § 35 ("The State of West Virginia shall never be made a defendant in any court of law or equity . . .").

[12] See, *e. g.,* Colo. Rev. Stat. § 24–10–106 (1998) (waiving immunity in tort claims only for injuries resulting from operation of a motor vehicle, operation of a public hospital or a correctional facility, the dangerous condition of a public building, the dangerous condition of a public highway or road, a dangerous condition caused by snow or ice, or from the operation of any public utility facility); Minn. Stat. Ann. § 3.736 (Supp. 1998–1999) (waiver of immunity invalid when loss arises from state employee who exercises due care or performance or failure to perform discretionary duty); Md. Cts. & Jud. Proc. Code Ann. § 5–522(a)(5) (1998) (immunity not waived if a claim from a single occurrence exceeds $100,000).

[13] In the House Report advocating the creation of the Federal Circuit, Congress noted, "The infrequency of Supreme Court review of patent cases leaves the present judicial system without any effective means of assuring even-handedness nationwide in the administration of the patent laws." H. R. Rep. No. 97–312, at 22.

Even if state courts elected to hear patent infringement cases against state entities, the entire category of such cases would raise questions of impartiality. This concern underlies both the constitutional authorization of diversity jurisdiction and the statutory provisions for removal of certain cases from state to federal courts, 28 U. S. C. § 1441 *et seq.* The same concern justified John Marshall's narrow construction of the Eleventh Amendment in *Cohens* v. *Virginia,* 6 Wheat. 264 (1821). As he there noted, when there is a conflict between a State's interest and a federal right, it "would be hazarding too much to assert, that the judicatures of the States will be exempt from the prejudices by which the legislatures and people are influenced, and will constitute perfectly impartial tribunals." *Id.,* at 386.

Finally, this Court has never mandated that Congress must find "'widespread and persisting deprivation of constitutional rights,'" *ante,* at 645, in order to employ its § 5 authority. It is not surprising, therefore, that Congress did not compile an extensive legislative record analyzing the due process (or lack thereof) that each State might afford for a patent infringement suit retooled as an action in tort. In 1992, Congress had no reason to believe it needed to do such a thing; indeed, it should not have to do so today.

### III

In my view, Congress had sufficient evidence of due process violations, whether actual or potential, to meet the requirement we expressed in *City of Boerne* that Congress can act under § 5 only to "remedy or prevent unconstitutional actions." See 521 U. S., at 519. The Court's opinion today threatens to read Congress' power to pass prophylactic legislation out of § 5 altogether; its holding is unsupported by *City of Boerne* and in fact conflicts with our reasoning in that case.

In *City of Boerne* we affirmed the well-settled principle that the broad sweep of Congress' enforcement power en-

compasses legislation that deters or remedies constitutional violations, even if it prohibits conduct that is not itself unconstitutional, and even if it intrudes into spheres of autonomy previously reserved to the States. *Id.*, at 518. Nevertheless, we held that the enactment of the Religious Freedom Restoration Act of 1993 (RFRA) was not an "appropriate" exercise of Congress' enforcement power under § 5 of the Fourteenth Amendment. *Id.*, at 536.

By enacting RFRA Congress sought to change the meaning of the Free Exercise Clause of the First Amendment as it had been interpreted by this Court, rather than to remedy or to prevent violations of the Clause as we had interpreted it. We held that RFRA had crossed "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law." *Id.*, at 519–520. Congress' § 5 power is "corrective or preventive, not definitional." *Id.*, at 525. Our extensive review of the legislative history of RFRA made it clear that the statute could not be fairly characterized as a remedial measure, but rather was a legislative attempt "to interpret and elaborate on the meaning" of the Free Exercise Clause. By doing so, Congress had violated the principle that the "power to interpret the Constitution in a case or controversy remains in the Judiciary." *Id.*, at 524.

The difference between the harm targeted by RFRA and the harm that motivated the enactment of the Patent Remedy Act is striking. In RFRA Congress sought to overrule this Court's interpretation of the First Amendment. The Patent Remedy Act, however, was passed to prevent future violations of due process, based on the substantiated fear that States would be unable or unwilling to provide adequate remedies for their own violations of patent holders' rights. Congress' "wide latitude" in determining remedial or preventive measures, see *id.*, at 520, has suddenly become very narrow indeed.

*City of Boerne* also identified a "proportionality" component to "appropriate" legislation under §5. Our opinion expressly recognized that "preventive rules are sometimes appropriate" if there is

> "a congruence between the means used and the ends to be achieved. The appropriateness of remedial measures must be considered in light of the evil presented. See *South Carolina* v. *Katzenbach*, 383 U. S., at 308. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one. *Id.*, at 334." *Id.*, at 530.

In RFRA we found no such congruence, both because of the absence of evidence of widespread violations that were in need of redress, and because the sweeping coverage of the statute ensured "its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter." *Id.*, at 532.

Again, the contrast between RFRA and the Act at issue in this case could not be more stark. The sole purpose of this amendment is to abrogate the States' sovereign immunity as a defense to a charge of patent infringement. It has no impact whatsoever on any substantive rule of state law, but merely effectuates settled federal policy to confine patent infringement litigation to federal judges. There is precise congruence between "the means used" (abrogation of sovereign immunity in this narrow category of cases) and "the ends to be achieved" (elimination of the risk that the defense of sovereign immunity will deprive some patentees of property without due process of law).

That congruence is equally precise whether infringement of patents by state actors is rare or frequent. If they are indeed unusual, the statute will operate only in those rare cases. But if such infringements are common, or should become common as state activities in the commercial

arena increase, the impact of the statute will likewise expand in precise harmony with the growth of the problem that Congress anticipated and sought to prevent. In either event the statute will have no impact on the States' enforcement of their own laws. None of the concerns that underlay our decision in *City of Boerne* are even remotely implicated in this case.

The Patent Remedy Act merely puts States in the same position as all private users of the patent system,[14] and in virtually the same posture as the United States.[15] "When

---

[14] As the Senate said in its Report on the Act, "the current state of the law leaves the protection afforded to patent and trademark holders dependant on the status of the infringing party. A public school such as UCLA can sue a private school such as USC for patent infringement, yet USC cannot sue UCLA for the same act." S. Rep. No. 102–280, p. 9 (1992).

[15] The majority's assertion that "the Patent Remedy Act does not put States in the same position as the United States," *ante*, at 648, n. 11, is misleading. In the case of private infringement suits, treble damages are available only "where the infringer acted in wanton disregard of the patentee's patent rights, that is, where the infringement is willful." *Read Corp.* v. *Portec, Inc.*, 970 F. 2d 816, 826 (CA Fed. 1992) (reversing the District Court's award of enhanced damages). "On the other hand, a finding of willful infringement does not mandate that damages be enhanced, much less mandate treble damages." *Ibid.* Attorney's fees are available only in "exceptional" circumstances. 35 U. S. C. §285. Once it has determined that the case is "exceptional," the district court has discretion whether or not to award attorney's fees and the fees "must be reasonable." *Gentry Gallery, Inc.* v. *Berkline Corp.*, 134 F. 3d 1473, 1480 (CA Fed. 1998). In addition, attorney's fees are available in limited circumstances in suits against the United States. *Ante*, at 648, n. 11.

The remaining differences between the United States' waiver of sovereign immunity and the Patent Remedy Act are supported by quintessentially federal concerns. This Court has found that "the procurement of equipment by the United States is an area of uniquely federal interest." *Boyle* v. *United Technologies Corp.*, 487 U. S. 500, 507 (1988). Indeed, the importance of the federal interest in military procurement led this Court to fashion the doctrine of "Government contractors' immunity" without waiting for Congress to consider the question. *Id.*, at 531 (STEVENS, J., dissenting). Injunctions are not available against the United States be-

Congress grants an exclusive right or monopoly, its effects are pervasive; no citizen or State may escape its reach." *Goldstein* v. *California*, 412 U. S. 546, 560 (1973) (analyzing Copyright Clause). Recognizing the injustice of sovereign immunity in this context, the United States has waived its immunity from suit for patent violations. In 1910, Congress enacted a statute entitled, "An Act to provide additional protection for owners of patents of the United States." Ch. 423, 36 Stat. 851. The Act provided that owners of patents infringed by the United States "may recover reasonable compensation for such use by suit in the Court of Claims." The United States has consistently maintained this policy for the last 90 years. See 28 U. S. C. § 1498.

In my judgment, the 1992 Act is a paradigm of an appropriate exercise of Congress' § 5 power.[16]

## IV

For these reasons, I am convinced that the 1992 Act should be upheld even if full respect is given to the Court's recent cases cloaking the States with increasing protection from congressional legislation. I do, however, note my continuing dissent from the Court's aggressive sovereign immunity jurisprudence; today, this Court once again demonstrates itself to be the champion of States' rights. In this case, it seeks to guarantee rights the States themselves did not express any particular desire in possessing: during Congress' hearings on the Patent Remedy Act, although invited to do so,

---

cause of the Federal Government's extensive investment in patented military inventions. "[T]he right to enjoin the officer of the United States . . . virtually asserts the existence of a judicial power to close every arsenal of the United States." *Crozier* v. *Krupp A. G.*, 224 U. S. 290, 302 (1912).

[16] I am also persuaded that a State like Florida that has invoked the benefits of the federal patent system should be deemed to have waived any defense of sovereign immunity in patent litigation. The reasoning in JUSTICE BREYER's dissent in *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, *post*, at 693–699, applies with special force to this case.

the States chose not to testify in opposition to the abrogation of their immunity.[17]

The statute that the Court invalidates today was only one of several "clear statements" that Congress enacted in response to the decision in *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234 (1985).[18] In each of those clarifications Congress was fully justified in assuming that it had ample authority to abrogate sovereign immunity defenses to federal claims, an authority that the Court squarely upheld in *Pennsylvania* v. *Union Gas Co.,* 491 U. S. 1 (1989). It was that *holding*—not just the "plurality opinion," see *ante,* at 636—that was overruled in *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44 (1996). The full reach of that case's dramatic expansion of the judge-made doctrine of sovereign immunity is unpredictable; its dimensions are defined only by the present majority's perception of constitutional penumbras rather than constitutional text. See *id.,* at 54 (acknowledging " 'we have understood the Eleventh Amendment to stand not so much for what it says' " (citation omitted)). Until this expansive and judicially crafted protection of States' rights runs its course, I shall continue to register my agreement with the views expressed in the *Seminole* dissents and in the scholarly commentary on that case.

I respectfully dissent.

---

[17] H. R. Rep. No. 101–960, p. 7 (1990) ("The Subcommittee invited State attorneys general and representatives of State universities to testify, but none made themselves available for the hearing").

[18] See, *e. g.,* 42 U. S. C. § 12202 (Americans with Disabilities Act of 1990); 11 U. S. C. § 106(a) (Bankruptcy Reform Act of 1994); 29 U. S. C. § 2617(a)(2) (Family and Medical Leave Act of 1993); 15 U. S. C. § 1125(a) (Trademark Remedy Clarification Act); 20 U. S. C. § 1403(a) (Individuals with Disabilities Education Act); 17 U. S. C. § 511 (Copyright Remedy Clarification Act).